DAVID A. HUBBERT
Deputy Assistant Attorney General

ALEXANDER E. STEVKO
TY HALASZ
Trial Attorneys, Tax Division
U.S. Department of Justice
P.O. Box 683
Washington, D.C. 20044
*Tel*. (202) 616-2380 (Stevko)
*Tel*. (202) 307-6484 (Halasz)
*Fax*. (202) 307-0054
Alexander.Stevko@usdoj.gov
Ty.Halasz@usdoj.gov
*Counsel for the United States*

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON
PORTLAND DIVISION

| | |
|---|---|
| United States of America,<br><br>    Plaintiff,<br><br>        *v*.<br><br>Ali Mahyari; and Roza Malekzadeh,<br><br>    Defendants. | Case No. 3:20-CV-1887-IM<br><br>UNITED STATES' MOTION FOR<br>SUMMARY JUDGMENT |

## TABLE OF CONTENTS

I.      LR 7-1(a) Certification ................................................................................. 1

II.     Introduction and Motion ............................................................................. 1

III.    Issues to be Decided ................................................................................... 3

IV.     Statement of Facts ...................................................................................... 4

        A.      The Defendants and the Property ...................................................... 4

        B.      The Foreign Accounts ...................................................................... 6

        C.      The Return Preparer and the Returns ............................................... 8

        D.      The IRS ........................................................................................ 10

V.      Memorandum of Law .............................................................................. 12

        A.      Summary Judgment Standard .......................................................... 12

        B.      The FBAR Generally ...................................................................... 13

        C.      Heightened Penalties for Willfulness ............................................... 14

        D.      Common Evidence of Willfulness or Recklessness in the FBAR Context ...... 17

        E.      Defendants Willfully Failed to File FBARs ..................................... 18

                1.      Defendants used the foreign bank accounts as part of a scheme to underreport income. ......................................................... 19

                2.      Defendants did not disclose their accounts to their tax preparer or the IRS. ........................................................................ 20

                3.      Defendants did not inquire about FBAR reporting requirements. ........ 23

                4.      The FBAR statute does not authorize a reasonable cause defense. ...... 26

VI.     Conclusion ............................................................................................... 28

# TABLE OF AUTHORITIES

**Federal Cases**

*Anderson v. Liberty Lobby Inc.*,
477 U.S. 242 (1986) ........................................................................................... 12

*Bedrosian v. United States*,
912 F.3d 144 (3d Cir. 2018) .................................................................. 15, 16, 21

*Cohen v. United States*,
999 F. Supp. 2d 650 (S.D.N.Y. 2014) .................................................................. 27

*Enayat v. Comm'r*,
T.C. Memo. 2009-257 ........................................................................................... 23

*Farmer v. Brennan*,
511 U.S. 825 (1994) ........................................................................................... 16

*Global-Tech Appliances Inc. v. SEB S.A.*,
563 U.S. 754 (2011) ........................................................................................... 16

*Jarnagin v. United States*,
134 Fed. Cl. 368 (2017) ................................................................................. 26, 27

*Jones v. United States*,
No. 19-CV-4950, 2020 WL 4390390 (C.D. Cal. May 11, 2020) ........................... 14

*Kimble v. United States*,
141 Fed. Cl. 373 (2018) ............................................................... 16, 17, 18, 20, 22

*Lefcourt v. United States*,
125 F.3d 79 (2d Cir. 1997) .................................................................................. 16

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986) ...................................................................................... 13, 14

*Norman v. United States*,
942 F.3d 1111 (Fed. Cir. 2019) .......................................................................... 15

*Safeco Ins. Co. v. Burr*,
551 U.S. 47 (2007) ....................................................................................... 15, 16

*United States v. de Forrest*,
463 F. Supp. 3d 1150 (D. Nev. 2020) ............................................................ 15, 18

*United States v. Doherty*,
233 F.3d 1275 (11th Cir. 2000) ..................................................................... 18, 22

*United States v. Gentges*,
   531 F. Supp. 3d 731 (S.D.N.Y. 2021)............................................................... 18, 21

*United States v. Goldsmith*,
   541 F. Supp. 3d 1058 (S.D. Cal. 2021)............................................................ 15, 16

*United States v. Great Am. Ins. Co. of New York*,
   738 F.3d 1320 (Fed. Cir. 2013).............................................................................. 18

*United States v. Horowitz*,
   978 F.3d 80 (4th Cir. 2020) ...................................................... 15, 16, 17, 20, 25

*United States v. McBride*,
   908 F. Supp. 2d 1186 (D. Utah 2012)............................................................... 16, 17

*United States v. Ott*,
   441 F. Supp. 3d 521 (E.D. Mich. 2020)............................................................ 18, 24

*United States v. Poole*,
   640 F.3d 114 (4th Cir. 2011) ................................................................................ 17

*United States v. Rum*,
   995 F.3d 882 (11th Cir. 2021) ...................................................... 15, 16, 18, 22, 24

*United States v. Schwarzbaum*,
   No. 18-CV-81147, 2020 WL 1316232 (S.D. Fla. Mar. 20, 2020)................................. 18, 24

*United States v. Schwarzbaum*,
   24 F.4th 1355 (11th Cir. 2022) ............................................................................ 15

*United States v. Williams*,
   489 F. App'x 655 (4th Cir. 2012) ................................................... 17, 18, 24, 25

*United States v. Zimmerman*,
   No. 2:19-CV-4912, 2020 WL 6065333 (C.D. Cal. Sept. 16, 2020) .......................... 15

*US Local 343 United Ass'n of Journeyman Apprentices of Plumbing & Pipefitting
   Indus. of U.S. & Canada, AFL-CIO v. Nor-Cal Plumbing Inc.*,
   48 F.3d 1465 (9th Cir. 1994) ................................................................................ 13

*Zetwick v. Cty. of Yolo*,
   850 F.3d 436 (9th Cir. 2017) ................................................................................ 13

**Federal Statutes**

31 U.S.C. § 5314 ....................................................................................................... 1, 13
31 U.S.C. § 5321 ............................................................................................. 3, 14, 15, 26

Bank Secrecy Act,
    Pub. L. No. 91-508, 84 Stat. 1114 (1970) ........................................................................ 1, 13

## Federal Regulations

26 C.F.R. § 1.6664-4 .................................................................................................... 26, 27
31 C.F.R. § 1010.306 ........................................................................................................ 14
31 C.F.R. § 1010.350 ............................................................................................... 7, 13, 14

## Other Federal Authorities

Fed. R. Civ. P. 56............................................................................................................... 12
H.R. Rep. No. 91-975 (1970) ............................................................................................... 1

# I.  LR 7-1(a) CERTIFICATION

During the weeks preceding the filing of this motion, counsel for the parties exchanged numerous emails. Through good-faith discussions, the parties have narrowed their dispute to certain elements of the case as described below but have been unable to resolve the case.

# II.  INTRODUCTION AND MOTION

In enacting the Bank Secrecy Act (BSA), Pub. L. No. 91-508, 84 Stat. 1114 (1970), Congress addressed the "serious and widespread use," for the "purpose of violating American law," of "foreign financial facilities located in" jurisdictions that provide secrecy to account holders. H.R. Rep. No. 91-975 (1970), *reprinted in* 1970 U.S.C.C.A.N. 4394, 4397. To combat such use of secret foreign accounts — and combat tax evasion and other wrongdoing — Congress required U.S. persons who have relationships with foreign financial agencies to report those relationships to the government by filing the Report of Foreign Bank and Financial Accounts, commonly called an "FBAR". *See* 31 U.S.C. § 5314(a). In this suit, the United States seeks to reduce civil FBAR penalty assessments to judgment.

Ali Mahyari and Roza Malekzadeh portray themselves as mild-mannered taxpayers trying their best, a conclusion not supported by the undisputed facts in this case. Time and again, on numerous discrete occasions over multiple years, Defendants either withheld required information from or misrepresented themselves to governmental authorities. First, they sold property in Iran for over $2 million, and even though they claim they believed the income was not taxable, they reported the sale to the IRS. But they misrepresented both the amount of sale and their gain on the sale, and later agreed they had underreported their income by over $680,000. Second, to avoid criminal sanctions from moving the property's proceeds back to America, they obtained a regulatory license from the Department of the Treasury. But they had

already moved a significant portion of the money back before they sought the license and barely moved anything after they obtained it. Third, they used banks in Iran and Canada to store a large portion of the property's proceeds and facilitate transfers of some of the proceeds back to the United States. But they did not file FBARs reporting these accounts to the U.S. government. Finally, they were asked on multiple occasions by both their tax preparer and IRS agents whether they had any foreign financial accounts. But they said no each time. These actions taken together evince an intentional effort to conceal or obscure the true nature of their activities in Iran. Even drawing all inferences in their favor on summary judgment, such conduct was, at a minimum, reckless.

This is precisely the kind of wrongdoing that Congress sought to combat in the BSA. By keeping their foreign bank accounts secret from the IRS for years, Defendants obscured hundreds of thousands of dollars of income. Their defense of ignorance is flimsy at best because the undisputed facts show how sophisticated they are. Armed with advanced degrees from around the world, they run their own business flipping houses in the United States, a business that requires experience buying and selling property and paying tax on such transactions. They also had access to sophisticated advisors, but repeatedly provided inaccurate information and ignored warning signs that should have put them on notice of the FBAR requirements. The undisputed facts show Defendants' failure to file FBARs was willful within the meaning of the statute, giving rise to heightened penalties, because they intended to conceal the accounts and related taxable gains from the IRS, or at the very least they were reckless in not asking about their reporting requirements when they had many opportunities to.

The United States moves for summary judgment for a determination that Defendants' failure to file FBARs was willful and that they therefore are subject to the heightened penalty.

### III. ISSUES TO BE DECIDED

The ultimate issues in this case are whether Defendants are liable for the willful FBAR penalty pursuant to 31 U.S.C. § 5321(a)(5)(C), and if so, the proper amount of the penalty. The Court's scheduling order (ECF No. 14) bifurcated the determination of willfulness from the propriety of the IRS's specific calculation of the penalty amount. The general issue for the Court to decide for this motion, then, is whether Defendants are liable for the willful FBAR penalty. As discussed below, there are four elements required to show liability for the willful FBAR penalty, but only the fourth is in dispute. Therefore, the court needs to decide only one specific issue: whether Defendants' failure to file their required FBARS was "willful" as defined by the statute.

### IV.  STATEMENT OF FACTS

#### A.  The Defendants and the Property

Ali Mahyari and Roza Malekzadeh, a married couple, are Iranian-American architects. Both received degrees in architecture in Tehran, and Mr. Mahyari received a Ph.D. from Sydney University in Australia. **Exhibit A**, Ali Dep. 14:20–24; **Exhibit B**, Roza Dep. 11:12–23. In 2001, Ms. Malekzadeh moved their family to the United States, and Mr. Mahyari followed in 2005. Ali Dep. 19:1–11; Roza Dep. 9:24–10:1. They both became United States citizens in 2006. Ali Dep. 14:5–8; Roza Dep. 11:4–8. Their primary work is flipping houses, though Ms. Malekzadeh has a full-time job with the City of Portland's Bureau of Development Services and Mr. Mahyari briefly taught Farsi at the Defense Language Institute in Monterey, California. Ali Dep. 20:2–21:10; Roza Dep. 13:9–16, 16:17–17:7.

In the mid-1980s, Defendants purchased a home in Lavasan, Iran, Ali Dep. 38:17–18, an area which some Iranians call "the Beverly Hills or Switzerland of Tehran." Lavasan, IRAN TOURISM & TOURING ORG., https://perma.cc/3T5C-NGFS (last visited Apr. 15, 2022); *see*

**Exhibit E**, Cook Decl. ¶ 11. Defendants lived primarily in this house not far from downtown

Tehran until coming to the United States. Ali Dep. 41:2–14. Eventually, Defendants decided to

sell the property. In February 2011, Mr. Mahyari traveled to Iran to facilitate the sale. *See* Ali

Dep. 43:16–25; **Exhibit 2**, Sale Agreement.[1] The sale was completed on May 4 for the price of

23,692,500,000 rials, or 2,369,250,000 toman, less fees and taxes, which was $2,879,146.92 in

dollars.[2] *See* Ali Dep. 52:1–6, 14–17, 60:2–5; **Exhibit 3**, Deed Docs. Defendants paid at least 12

million rials ($1,458.26) in taxes to Iran on the sale. Ex. 3 at 3.

      Defendants received the proceeds in a series of payments that Mr. Mahyari sent bit by bit

to the United States through money exchanges. Ali Dep. 54:1–8, 55:12–16; *see* **Exhibit 4**, Wire

Receipts.  Such wire transfers reflected on Defendants' bank statements are set forth in the

following table:

| Date | Receiving Bank | Amount | Citation |
|------|----------------|--------|----------|
| March 1, 2011 | Bank of America | $87,390.00 | Ex. 14 at 3 |
| March 3, 2011 | Bank of America | $177,092.00 | Ex. 14 at 4 |
| March 3, 2011 | Bank of America | $109,970.00 | Ex. 14 at 4 |
| March 7, 2011 | Bank of America | $119,975.00 | Ex. 14 at 4 |
| March 7, 2011 | Bank of America | $99,943.00 | Ex. 14 at 4 |
| March 11, 2011 | Bank of America | $149,985.00 | Ex. 14 at 6 |
| March 11, 2011 | Bank of America | $148,975.00 | Ex. 14 at 6 |
| May 23, 2011 | Bank of America | $167,449.00 | Ex. 14 at 9 |
| May 25, 2011 | Bank of America | $170,391.09 | Ex. 14 at 9 |
| June 1, 2011 | Bank of America | $102,825.00 | Ex. 14 at 9 |
| December 20, 2011 | Wells Fargo | $16,300.00 | Ex. 13 at 1 |
| June 25, 2012 | Citibank | $111,764.00 | Ex. 12 at 1 |
| March 4, 2013 | Citibank | $56,928.00 | Ex. 12 at 2 |
| September 23, 2013 | Citibank | $34,474.00 | Ex. 12 at 3 |
|  | **Total** | **$1,553,461.09** |  |

---

[1]  The parties have stipulated that, for purposes of this litigation, the translations of Farsi
documents attached as exhibits are correct.

[2]  For these conversions to United States dollars, the United States is using the Treasury
Reporting Rates of Exchange as of December 31, 2011, which is attached to Exhibit 6 and states
that $1 is equal to 8,229 rials.  *See* Ex. 6 at 10.

*See* **Exhibit 12**, Citibank Docs; **Exhibit 13**, Wells Fargo Docs; **Exhibit 14**, Bank of America

Docs.

Most if not all of these transfers were subject to unpredictably high exchange rates due to

the money exchanges operating in a sort of unofficial capacity to avoid existing sanctions against

Iran. *See* Ali Dep. 75:1–17, 89:14–90:2; Roza Dep. 76:2–23. But despite the variable exchange

rates, during the calendar year 2011, Defendants used at least 11 wire transfers to move at least

$1,350,295.09 to their accounts in the United States. Some of these transfers may have included

both proceeds from the Lavasan house sale itself and proceeds from the sale of personal

property, but most of them constitute proceeds from the Lavasan house. Ali Dep. 123:8–21,

124:10–19, 126:20–25.

While these transfers were occurring, Defendants retained Mehrnoush Yazdanyar, a Los

Angeles-area attorney, on April 24, 2011, to procure a license from Treasury's Office of Foreign

Assets Control (OFAC) that would enable them to transfer money from the sale of the property

to the United States without penalties resulting from U.S. sanctions against Iran. *See* Ali Dep.

78:1–12, 79:16–80:7; **Exhibit 17** at 1, Yazdanyar Docs. Ms. Yazdanyar requested a license from

OFAC, stating that Mr. Mahyari "would like to sell the land he owns there and transfer the funds

to the United States." Ex. 17 at 3. Though she noted that it was "difficult to give an exact

timeline as to when Mr. Mahyari expects to receive the funds", she expected "that the property

will be sold within the next year. Ex. 17 at 3. Mr. Mahyari had already initiated the property's

sale by the time he retained Ms. Yazdanyar. *Compare* Ex. 17 at 2, *with* Ex. 2 at 4.

The OFAC License was ultimately issued on October 24, 2011. **Exhibit 16**, OFAC Docs.

The license includes a few notable passages:

> This License does not excuse compliance with any law or regulation administered by the Office of Foreign Assets Control or another agency (including reporting requirements) applicable to the transactions herein licensed, nor does it release Licensees or third parties from civil or criminal liability for violation of any law or regulation.

Ex. 16 at 3, ¶ 5. Mr. Mahyari claims he never read Paragraph 5 of the license, nor did he ask anyone about possible other reporting requirements. Ali Dep. 85:11–17, 86:3–6, 86:16–19.

> The authorization set forth in this License applies only to laws and regulations administered by the Office of Foreign Assets Control, and should not be interpreted to excuse the Licensees from compliance with other laws, regulations, orders or rulings to which they may be subject.

Ex. 16 at 4, § 3(c). Mr. Mahyari says he never read Section 3(c), nor did he ask anyone about possible compliance with other laws. Ali Dep. 86:24–87:13, 87:14–88:1.

> The Licensees are subject to the recordkeeping and reporting requirements of, inter alia, 31 C.F.R. §§ 501.601 and 501.602, including the requirement to maintain records concerning the transactions undertaken pursuant to this License for a period of five years.

Ex. 16 at 5, § 4. Title 31 of the Code of Federal Regulations also contains the regulations requiring foreign accounts to be disclosed. *See* 31 C.F.R. § 1010.350.

## B. The Foreign Accounts

Long before the Lavasan property's sale, between 2001 and 2005, Defendants opened two accounts in Canada with the Canadian Imperial Bank of Commerce (CIBC). Cook Decl. ¶ 17; **Exhibit 6**, CIBC Docs. The account ending in 5238 was open during 2011 and had a high balance of $36,873.47 on January 24, 2011. Ex. 6 at 3. The account ending in 2234 remained open at least through the end of 2013, though there was very little activity from mid-2011 onward. Ex. 6 at 5–7. During 2011, the high balance of this account was $44,621.28, and the high balance was $4,652.90 during both 2012 and 2013. Ex. 6 at 5–7; Doc. 4 ¶ 15.

When the Lavasan property's sale was close to completion, Ms. Malekzadeh traveled to Tehran to see it through by collecting the money and sending some of it to the United States. Roza Dep. 42:8–15, 44:17–21. As a part of this process, Ms. Malekzadeh opened a series of accounts at Eghtestad Novin (EN) Bank, a private bank in Tehran. **Exhibit 5**, Deposit Slips. There are no statements from EN Bank reflecting the accounts' activity during the years at issue, nor is it possible to obtain any. Ali Dep. 120:24–121:8. At a minimum, the deposit slips in Exhibit 5 establish that 6 billion rials belonging to the Defendants were held by EN Bank during May 2011, Ex. 5, which amounts to $729,128.69, *see* Ex. 6 at 10 (detailing the 2011 yearly average exchange rates).[3]

In March 2012, Iranian banks and money exchanges were cut off from SWIFT, the Society for Worldwide Interbank Financial Telecommunications, as part of sanctions on Iran. *See* Reuters Staff, *Payments system SWIFT to expel Iranian banks Saturday*, REUTERS (Mar. 15, 2012, 3:48 PM), https://perma.cc/EG2Q-S94H. Thereafter, it was more difficult to move money to the United States, so the remainder of Defendants' proceeds in Iran stayed behind with EN Bank. Ali Dep. 55:15–25, 57:10–12. Defendants had, however, close to a year from the completion of the sale in 2011 until the SWIFT closure, during which they left significant amounts in the EN Bank accounts. *Compare* Ex. 3 at 2, *with* Reuters Staff, *supra*. In fact, Defendants moved $893,330 into the United States before Ms. Yazdanyar was retained to seek an OFAC license but moved only $16,300.00 into the United States between the issuance of the OFAC license in October 2011 and the expulsion of Iran from SWIFT in March 2012. *Compare* Ex. 14 at 3–4, 6, *with* Ex. 13 at 1. At times, Ms. Malekzadeh's brother would help wire what

---

[3]  A more complete reconstruction of the EN Bank accounts will be advanced should the case progress to briefing on the penalty calculation.

money he could. Ali Dep. 130:2–20; Roza Dep. 41:2–4. Eventually, after the years at issue and

after the IRS began its examinations (discussed below), Defendants moved all the money out of

Iran. Ali Dep. 116:3–5, 117:5–6.

In sum, Defendants were aware of and intimately involved in their overseas affairs,

employing various efforts to move their money from Iran to the United States by any means

necessary, involving the OFAC license, the Canadian accounts, and the help of Ms.

Malekzadeh's brother. They also moved money into the United States through Canada with

physical gold and silver, purchased using the CIBC accounts. Cook Decl. ¶ 23.

## C.  The Return Preparer and the Returns

During the years at issue, Defendants employed David Niebur of Niebur's Tax Service to

prepare their federal and state tax returns. Roza Dep. 47:25–48:8. They used him to prepare their

personal and business returns for seven or eight years, including the years at issue. Ali Dep.

101:16–18, 102:4–7. Mr. Niebur is a licensed tax consultant in Oregon and an enrolled agent

with the IRS, and he has been preparing tax returns for 20 years. **Exhibit C**, Niebur Dep. 14:1–

11, 16–18. He prepares returns in person in front of the client after conducting an interview.

Niebur Dep. 20:19–23. The interview involves the same set of questions for every meeting,

which are all prompted by his tax preparation software, Drake Tax Software. Niebur Dep. 25:22–

25, 27:2–19, 28:11. The software will not allow him to generate a return without answering all of

its questions. Niebur Dep. 29:1–14. The software includes a question about whether a client has

any foreign accounts. Niebur Dep. 34:3–9. Specifically, that question is "Do you have any

ownership interest or signatures on any foreign bank accounts, trusts, or brokerage accounts?",

and if the client answers "yes", the ensuing question is "At any one day during the year, did you

have an accumulative balance of more than $10,000 in foreign accounts?" Niebur Dep. 60:12–20.

Ms. Malekzadeh was the one to spend most of the time meeting with Mr. Niebur. Ali Dep. 94:24–95:2; Roza Dep. 40:11–13. Mr. Niebur would ask questions about typical return information, such as the number of dependents, income that year, and any assets sold. Roza Dep. 51:20–52:6, 54:23–55:1. Defendants did not provide Mr. Niebur with the OFAC license or any documents relating to the Lavasan property. Niebur Dep. 44:13–21, 45:9–46:1, 46:7–13, 46:25–47:11. Defendants' 2011 tax return reflects the sale of the Lavasan property because Ms. Malekzadeh gave him the sale price and cost basis in dollars without any supporting documents. Niebur Dep. 49:17–50:12; *see* **Exhibit 7**, 2011 Return. Specifically, on Form 8949, under Long-Term Capital Gains and Losses, the 2011 return lists a "HOME IN IRAN" as acquired in 1991, sold on April 18, 2011, with both a sale price and cost basis of $500,000, resulting in neither a gain nor a loss. Ex. 7 at 9–10. This entry was later changed after examination by the IRS as described below.

Mr. Niebur was not aware of either the CIBC accounts or EN Bank accounts when he prepared Defendants' original 2011, 2012, and 2013 returns. Niebur Dep. 54:10–55:2. He asked Ms. Malekzadeh whether Defendants had any foreign accounts using the specific question set forth above, and she told him no. Niebur Dep. 52:22 – 25. Despite that Defendants were routinely repatriating money through the foreign accounts during the years in question, she did not ask any follow-up questions or request clarification in response to Mr. Niebur's question. Niebur Dep. 56:15–22, 57:9–19, 58:6–13. In fact, Ms. Malekzadeh never asked him for clarification or to explain a question to her with regard to any subject. Niebur Dep. 65:8–12. Because she answered no for all three years at issue, Mr. Niebur's software never triggered the

required Schedule B, which must be completed by taxpayers with foreign accounts. *See* Ex. 7; **Exhibit 8**, 2012 Return Transcript; **Exhibit 9**, 2013 Return Transcript.

Mr. Mahyari would sign the returns under penalty of perjury but did not review them substantively himself. Ali Dep. 96:4–7; *e.g*., Ex. 7 at 3. He never did any research on tax laws or asked anyone questions about tax laws. Ali Dep. 96:8–16. And, despite his repeated involvement with his own foreign property sale and its proceeds, he never researched whether foreign property sales are taxable or asked anyone about it, including Mr. Niebur. Ali Dep. 105:9–20, 106:8–12. The Defendants never filed an amended return prior to the IRS exam described below. Ali Dep. 99:17–24.

**D.  The IRS**

In 2014, the IRS referred Defendants for an income-tax examination. Revenue Agent Lucas Klyzek, then a tax compliance officer, conducted an initial interview with both Defendants on August 5 to learn background information on Defendants and their business. **Exhibit D**, Klyzek Decl. ¶¶ 7, 10. R.A. Klyzek used a form questionnaire used in every audit. Klyzek Decl. ¶ 11. After going over Defendants' tax returns, he asked a long series of questions to learn more about their income. Klyzek Decl. ¶¶ 12, 14. Specifically, he asked questions about, among other things, assets sold, assets purchased, investments, commissions, rental income, royalties, alimony, partnerships, bonuses, trusts and estates, tax refunds, unemployment, benefits, and pensions. Klyzek Decl. ¶ 14. One of the questions he asked was whether Defendants had any foreign bank accounts. Klyzek Decl. ¶ 14(ff). Though the EN Bank account remained open at the time of the interview, they said no. Klyzek Decl. ¶ 14(ff).

Revenue Agent Joshua Cook, the agent assigned to the examination into tax years 2012 and 2013, conducted another interview with both Defendants on December 8, 2014. Cook Decl.

¶ 8. Mr. Mahyari told R.A. Cook that they had owned property in "a very nice part of Iran", sold it for $2,000,000, and were able to transfer some money back to the United States before sanctions made transfer more difficult. Cook Decl. ¶ 11. For the first time, Mr. Mahyari then disclosed the existence of the Iranian account, saying there was likely around $400,000 still in an Iranian bank. Cook Decl. ¶ 11. R.A. Cook asked if Defendants had disclosed all their bank accounts open during the 2012 and 2013, even repeating himself to emphasize how important it was to disclose all foreign bank accounts. Cook Decl. ¶¶ 8, 12. Having disclosed only the EN Bank accounts (and not the CIBC accounts, one of which was open through the end of 2013), Defendants responded that they had disclosed all their bank accounts. Cook Decl. ¶ 12.

After that interview, the IRS opened an examination into Defendants under Title 31 of the U.S. Code, also called an FBAR examination, as described below, for failing to report their foreign bank accounts. Cook Decl. ¶ 13. R.A. Cook conducted another interview with only Mr. Mahyari on August 10, 2015, this time in connection with the FBAR exam. Cook Decl. ¶ 14. For the first time, Mr. Mahyari disclosed the CIBC accounts. Cook Decl. ¶¶ 17–19. R.A. Cook also asked if Defendants disclosed their foreign accounts to Mr. Niebur, their tax-return preparer. Cook Decl. ¶ 24. Mr. Mahyari said they did not. Cook Decl. ¶ 24. R.A. Cook asked what steps Defendants had taken to become knowledgeable of reporting requirements, and Mr. Mahyari admitted he never asked Mr. Niebur or Ms. Yazdanyar about any such requirements, nor had he looked at anything on the Treasury or IRS websites. Cook Decl. ¶ 25. Mr. Mahyari claimed that he did not think the Lavasan property sale was taxable (despite doing no research) because he acquired the property before becoming a United States citizen. Cook Decl. ¶ 26. Mr. Mahyari echoed this notion in his deposition: despite paying capital gains on the sale of American

properties Defendants owned, Mr. Mahyari did not think he had to pay capital gains on the Lavasan property. Ali Dep. 104:3–6, 104:24–105:3. This notion is incorrect. Cook Decl. ¶ 26.

On September 1, 2015, R.A. Cook interviewed Ms. Malekzadeh by herself. Cook Decl. ¶ 27. She said the Lavasan property's sale was for $2 million and $1 million was still in Iran. Cook Decl. ¶ 28. Ms. Malekzadeh did not mention the CIBC accounts until R.A. Cook specifically asked about them. Cook Decl. ¶ 31. Ms. Malekzadeh said she did not think there were any reporting requirements for foreign accounts by virtue of the OFAC license but admitted she did not conduct any further research, such as using the IRS or Treasury websites, asking Mr. Niebur, or asking Ms. Yazdanyar. Cook Decl. ¶ 32.

Ultimately, in connection with the income-tax examination, R.A. Cook found that Defendants underreported their long-term capitals gains from the property sale by $685,415, resulting in a tax deficiency (difference between reported tax and actual tax owed) of $96,408. Cook Decl. ¶ 37. Defendants signed off and agreed to the deficiency amount resulting from the sale. Cook Decl. ¶ 38. In connection with the FBAR exam, the IRS imposed a total penalty of $302,430 on each of the Defendants spread across 2011, 2012, and 2013. **Exhibit 10**, Form 13448 for Ali; **Exhibit 11**, Form 13448 for Roza.

## V.  MEMORANDUM OF LAW

### A.  Summary Judgment Standard

Summary judgment is appropriate when there is no genuine dispute as to any material fact and a party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine factual dispute exists where the evidence presented is so contradictory that judgment could enter for either party at trial. *See Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986). In

evaluating the motion, the Court views all evidence in the light most favorable to the nonmovant. *See Zetwick v. Cty. of Yolo*, 850 F.3d 436, 440 (9th Cir. 2017).

If the movant has the burden of proof on a claim or defense, the movant must establish every element of its claim or defense by sufficient evidence. *See* Fed. R. Civ. P. 56(c)(1)(A). Once the moving party has met this initial burden, the burden shifts opposing party to establish that there is a genuine dispute over a material fact. *See, e.g.*, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 (1986); *US Local 343 United Ass'n of Journeyman Apprentices of Plumbing & Pipefitting Indus. of U.S. & Canada, AFL-CIO v. Nor-Cal Plumbing Inc.*, 48 F.3d 1465, 1471 (9th Cir. 1994).

This burden is not negligible, and if the evidence brought by the opposing party "is merely colorable or is not significantly probative summary judgment may be granted." *Id.* The opposing party cannot meet its burden simply by offering conclusory statements unsupported by factual data or by showing that there is some metaphysical doubt as to the material facts. *See Matsushita*, 475 U.S. at 586–87.

## B.  The FBAR Generally

Under the Bank Secrecy Act (BSA), United States citizens or resident aliens having certain interests in foreign bank accounts must report that interest to the IRS on a Report of Foreign Bank and Financial Accounts (FBAR). 31 U.S.C. § 5314; 31 C.F.R. § 1010.350(a). To fulfill these requirements for 2011 and 2012, a person must have filed a Form TD F 90-22.1, and to fulfill the requirement for 2013, a person must have filed a FinCEN Form 114 — for purposes of this motion, the United States will refer to both collectively as "FBARs". For the years at issue, an FBAR was due by June 30 "of each calendar year with respect to foreign financial

accounts exceeding $10,000 maintained during the previous calendar year." 31 C.F.R.
§ 1010.306(c).

The IRS imposes "a civil money penalty on any person who violates" the FBAR
reporting requirements. 31 U.S.C. § 5321(a)(5)(A). The amount of the penalty is capped at
$10,000 for non-willful violations. *Id.* § 5321(a)(5)(B). But for willful violations, the maximum
amount of the civil penalty is "the greater of" $100,000 or 50 percent of "the balance in the
[foreign] account at the time of the violation." *Id.* § 5321(a)(5)(C)(i), (D)(ii).[4] By statute, there is
no reasonable cause defense for willful FBAR penalties. *Id.* § 5321(a)(5)(C)(ii).

## C. Heightened Penalties for Willfulness

To show that someone is liable for the willful FBAR penalty, the United States must
show by a preponderance of the evidence, that the individual (1) is a U.S. citizen or resident
alien; (2) had an interest in, or authority over a foreign financial account; (3) had a total balance
across all foreign accounts exceeding $10,000.00 at some point during the reporting period; and
(4) willfully failed to disclose the account on an FBAR. 31 C.F.R. §§ 1010.350, 1010.306(c);
*Jones v. United States*, No. 19-CV-4950, 2020 WL 4390390 at *5 (C.D. Cal. May 11, 2020).

In this case, Defendants have admitted that they did not timely file FBARs (ECF No. 4
¶ 14, Defendants' Answer (admitting ¶ 38 of the Complaint)). And they admit they were United
States citizens (ECF No. 4 ¶ 3 (admitting ¶¶ 5–6 of the Complaint)), had ownership of or signing
authority over foreign bank accounts (ECF No. 4 ¶ 4 (admitting relevant portions of ¶ 19 of the
Complaint)), and the total balance of the financial accounts exceeded $10,000 for the years at
issue (ECF No. 4 ¶ 15 (admitting to all but one of the high balances in ¶ 43 of the Complaint, but

---

[4] For simplicity, this brief refers to the statutory and regulatory reporting requirements as the
"FBAR requirements" or "FBAR obligations," and to the penalties for such violations as "FBAR
penalties."

admitting to there being at least $10,000 each year)). The only remaining issue is therefore whether Defendants' failure to file FBARs was "willful".

Although Congress provided a greater penalty for "willful" violations of the FBAR reporting requirements, it did not define the term "willful." *See* 31 U.S.C. § 5321(a)(5)(C). The Supreme Court has made clear, however, that "where willfulness is a statutory condition of civil liability," the term generally covers "not only knowing violations of a standard, but reckless ones as well." *Safeco Ins. Co. of America v. Burr*, 551 U.S. 47, 57 (2007). Every circuit to consider the meaning of "willful" in the civil FBAR context has similarly held that it encompasses "reckless" violations. *See, e.g.*, *United States v. Schwarzbaum*, 24 F.4th 1355, 1363 (11th Cir. 2022) (reaffirming the willful standard from *Rum*); *United States v. Rum*, 995 F.3d 882, 889 (11th Cir. 2021); *United States v. Horowitz*, 978 F.3d 80, 88 (4th Cir. 2020); *Norman v. United States*, 942 F.3d 1111, 1115 (Fed. Cir. 2019); *Bedrosian v. United States*, 912 F.3d 144, 152–53 (3d Cir. 2018). Thus, a reckless disregard of a statutory duty satisfies the willfulness standard and is sufficient to impose the heightened FBAR penalties. Another way of framing the meaning of "willful" in this context is that it encompasses behavior that is "purposeful instead of inadvertent", but someone doesn't have to subjectively know of the reporting requirement and intend not to comply. *United States v. de Forrest*, 463 F. Supp. 3d 1150, 1157 (D. Nev. 2020) (citing *Lefcourt v. United States*, 125 F.3d 79, 83 (2d Cir. 1997)).

The Ninth Circuit has not ruled on the meaning of "willful" in the civil FBAR context, but district courts within the circuit have followed the unanimous precedent of other circuits to include a reckless disregard of the reporting requirement. *See, e.g.*, *United States v. Zimmerman*, No. 2:19-CV-4912, 2020 WL 6065333 at *4 (C.D. Cal. Sept. 16, 2020); *United States v.*

*Goldsmith*, 541 F. Supp. 3d 1058, 1089 (S.D. Cal. 2021). This Court should therefore follow suit and apply the same standard.

Civil recklessness refers to "conduct violating an objective standard: action entailing 'an unjustifiably high risk of harm that is either known or so obvious that it should be known.'" *Safeco*, 551 U.S. at 68 (quoting *Farmer v. Brennan*, 511 U.S. 825, 836 (1994)). Indeed, "[i]t is [the] high risk of harm, objectively assessed, that is the essence of recklessness at common law." *Id.* at 69. Applied to the civil FBAR context, the reckless standard applies when someone "clearly ought to have known" there was a grave risk an accurate FBAR was not being filed and was in a position to find out for certain. *Bedrosian*, 912 F.3d at 153.

Because recklessness is an "objective standard", *Safeco*, 551 U.S. at 68, courts have regularly granted summary judgment imposing the penalty when applying the standard. *See, e.g.*, *Rum*, 995 F.3d at 890 (upholding the grant of summary judgment determining a failure to file an FBAR was willful due to recklessness); *Horowitz*, 978 F.3d at 82 (upholding the grant of summary judgment determining a failure to file an FBAR was willful due to recklessness); *Goldsmith*, 541 F. Supp. 3d at 1109 (granting summary judgment as to the determination of willfulness); *Kimble v. United States*, 141 Fed. Cl. 373, 389 (2018), *aff'd* 991 F.3d 1238 (Fed. Cir. 2021).

Similar to recklessness, "willful blindness" to "obvious or known consequences of one's action also satisfies a willfulness requirement in both civil and criminal contexts." *United States v. McBride*, 908 F. Supp. 2d 1186, 1205 (D. Utah 2012) (quoting *Global-Tech Appliances Inc. v. SEB S.A.*, 563 U.S. 754, 766 (2011)). A willfully blind defendant "takes deliberate actions to avoid confirming a high probability of wrongdoing and who can almost be said to have actually known the critical facts." *Global-Tech*, 563 U.S. at 769. Willful blindness can "be inferred

where a defendant was subjectively aware of a high probability of the existence of a tax liability, and purposefully avoided learning the facts point to such liability." *United States v. Williams*, 489 F. App'x 655, 658 (4th Cir. 2012) (quoting *United States v. Poole,* 640 F.3d 114, 122 (4th Cir. 2011)).  Multiple courts have found that willful blindness satisfies the FBAR's willfulness requirement.  *See, e.g.*, *Williams*, 489 F. App'x at 658–59; *McBride*, 908 F. Supp. 2d at 1210.

If Defendants knew about their FBAR reporting requirements and intentionally failed to file them, or they were merely reckless or willfully blind as to their FBAR filing requirement, they are liable for the elevated willful FBAR penalty.

### D.  Common Evidence of Willfulness or Recklessness in the FBAR Context

Willfulness or recklessness for the civil FBAR penalty may be proven "through inference from conduct meant to conceal or mislead sources of income or other financial information," and it "can be inferred from a conscious effort to avoid learning about reporting requirements." *Williams*, 489 F. App'x at 658. If taxpayers have a lack of personal tax or accounting knowledge, relying on their own beliefs rather than discussing them with an expert indicates a "conscious effort to avoid learning about reporting requirements" and is reckless. *United States v. Ott*, 441 F. Supp. 3d 521, 530–31 (E.D. Mich. 2020).

Another common sign of recklessness, or even intentional concealment, is the failure to tell a tax preparer or other expert about foreign bank accounts and possible foreign income. *Kimble*, 141 Fed. Cl. at 384; *see also Horowitz*, 978 F.3d at 82–83 (discussing the tax implications of foreign activity with friends but not an accountant is reckless or willful blindness). This is particularly the case when money in a foreign account comprises a significant part of someone's net worth and someone spends significant time and effort tending to the

account. *United States v. Gentges*, 531 F. Supp. 3d 731, 751–52 (S.D.N.Y. 2021); *United States v. Schwarzbaum*, No. 18-CV-81147, 2020 WL 1316232 at *12 (S.D. Fla. Mar. 20, 2020).

Courts also look not only at the existence of a foreign account, but whether the foreign account was used in any way to conceal reportable income from the IRS. Using the foreign accounts to conceal income or as part of a scheme to conceal income from the government is potentially a sign of intentional failure to report and at the very least of recklessness if the taxpayer does not inquire about the proper treatment of foreign income. *Rum*, 995 F.3d at 891.

Taxpayers are also charged with reading the contents of a return they sign, even if they actually do not, and not reviewing the contents and inquiring further about a return is willful blindness and a sign of recklessness. *Kimble*, 141 Fed. Cl. at 384; *see United States v. Doherty*, 233 F.3d 1275, 1282 n.10 (11th Cir. 2000); *see also United States v. Great Am. Ins. Co. of New York*, 738 F.3d 1320, 1331 (Fed. Cir. 2013) (generally charging United States citizens with awareness of laws published in the U.S. Code and regulations in the federal register); *cf. Rum*, 995 F.3d at 890 (noting that signing an incorrect return doesn't necessarily create strict liability for a willful FBAR penalty but can be key evidence that contributes to a determination of recklessness).

### E. Defendants Willfully Failed to File FBARS

There can be no genuine dispute that Defendants displayed the key behaviors supporting a willfulness determination. Defendants intentionally concealed their foreign bank accounts from their own tax preparer and the IRS. Even if they did not subjectively know about the specifics of the FBAR penalty, their actions described in the statement of facts are not disputed, and they show repeated purposeful behavior to avoid learning about their reporting requirements, which meets the willful standard. *See de Forrest*, 463 F. Supp. 3d at 1157. Their decisions not to

investigate or ask about their reporting requirements despite their own confessed lack of specific

tax filing knowledge and regular personal involvement with their foreign affairs are undisputed

material facts showing at least willful blindness and recklessness, and the Court should grant this

motion for summary judgment.

1. ***Defendants used the foreign bank accounts as part of a scheme to underreport income.***

While Defendants later admitted to selling the Lavasan property for over $2 million, their

tax return reported they sold the property for only $500,000. The IRS tax exam determined that

Defendants had a gain of $685,415 from the property sale, but their 2011 tax return reported $0

in gain because they did not disclose the specific amounts to Mr. Niebur. Defendants' exam

resulted in a tax deficiency of $96,408, which means their initial failure to accurately account for

the property sale resulted in significant tax savings for Defendants. The Iranian and Canadian

bank accounts were key parts of this underreporting because the accounts allowed Defendants to

move money into the United States with little or no detection — some of it was eventually

converted to gold and silver purchased through the Canadian account and shipped to the United

States — and to store proceeds from the incorrectly reported sale. Such a use of a foreign

account to conceal income is a common indicator of recklessness or willfulness, *Rum*, 995 F.3d

at 891, and strikes at the exact reason the BSA authorizes penalties for the failure to disclose

foreign accounts

Indeed, even if Defendants did not understand the specific tax requirements of the foreign

property sale, the overall scheme showed a sophistication on their part that should have at least

triggered a duty to inquire further. For example, even if they did not know how foreign property

sales were taxed, they reported only $500,000 of proceeds to their tax preparer despite bank

records showing they wired over $1.3 million from Iran in 2011. This behavior probably shows

intentional concealment, but drawing all inferences in Defendants' favor on summary judgment, it shows recklessness on their part, at a minimum. Either way, they were not being forthright and not inquiring about their legal requirements connected to the Lavasan sale and their accounts.

Both Defendants even traveled to Iran separately to carry out the sale and coordinate with Ms. Malekzadeh's brother to wire money back, either directly to the United States when possible or to their Canadian account. Overall, they generated a significant taxable gain, spent significant time and resources carrying out the sale and getting money back into the United States (directly or through the Canadian account and gold and silver) and concealed this from the IRS, reducing their tax bill. The foreign bank accounts were a key part of this process, which is proof of their willfulness.

### 2. Defendants did not disclose their accounts to their tax preparer or the IRS.

For each of the years at issue, Defendants' licensed tax preparer, David Niebur, asked Ms. Malekzadeh at their in-person meeting if the Defendants had an interest in any foreign bank accounts. And for each of the years at issue, she said no. Both Defendants then signed their returns under penalty of perjury without reviewing them, and the returns failed to report an interest in foreign bank accounts.

From 2011 to 2013, Defendants were actively using both the Canadian and Iranian accounts, so they knew about them. This means that the failure to disclose the accounts to Niebur was intentional, and this shows that they were intentionally concealing the accounts or, at a minimum, reckless as to failing to report them. *See Horowitz*, 978 F.3d at 82–83; *Kimble*, 141 Fed. Cl. at 384.

This is particularly the case because the Lavasan sale proceeds and the amount in the foreign accounts comprised a significant and obvious part of Defendants' income and wealth.

*See Gentges*, 531 F. Supp. 3d at 751–52. They moved over $1.3 million from Iran to the United States in 2011 alone, and in 2012 there remained at least $729,128 in the Iranian account alone. Defendants filed IRS Form 1040 for 2011 reported only $17,328 in wages or salaries and $25,000 in gross business receipts (offset by $183,326 in cost of goods sold and expenses), which means that the $1,350,295.09 they successfully moved into the United States comprised *over 96 percent* of their gross income. *Compare* Ex. 7 at 1, 14–15, *with* Ex. 13 at 1, *and* Ex. 14 at 3–4, 6, 9. The sale proceeds were an extraordinarily significant source of income relative to their other sources.

Despite moving over one million United States Dollars in proceeds from a property sale, they reported that they sold the Lavasan property for just $500,000 (for a reported capital gain of $0). This is not an error attributable to exchange rates — Defendants' own bank statements show that regardless of the amount of rials and the exchange rate at the time, they received $1.3 million in *dollars* in their American accounts.

Looking only at the Lavasan property sale and its tax consequences, Defendants' omission of the proceeds from their Form 1040 was obvious and intentional. With regard to the foreign accounts, the proceeds represented a significant portion of their income that year, and failing to disclose details about it or their foreign account to their tax preparer is all the more inexcusable. When combined with the fact that Defendants had sold multiple properties as part of the business in Oregon, and they knew to report gains from those sales on their tax returns, the failure to disclose the details of the Lavasan sale and account is reckless because Defendants "clearly ought to have known" there was a grave risk of an error, and they were in a position to find out. *Bedrosian*, 912 F.3d at 153. Overall, as discussed above, this intentional or reckless

failure to honestly respond to Mr. Niebur's questions allowed them to initially avoid paying a significant amount of tax.

It is also worth noting that had Defendants answered Mr. Niebur honestly about their foreign bank accounts, their return would have included Schedule B, which is used both to report possible interest for tax purposes and to inform taxpayers about FBAR filing requirements. For the 2011 tax year, Line 7a of Schedule B states that if a taxpayer has a foreign bank account, they must file Form TD F 90-22.1. *See* 2011 Schedule B, IRS, https://perma.cc/ATM5-R6VA. As a matter of law, taxpayers are charged with reading the contents of returns they sign. *See Rum*, 995 F.3d at 890; *Doherty*, 233 F.3d at 1282 n.10; *Kimble*, 141 Fed. Cl. at 384. Therefore, if they had answered Mr. Niebur's question honestly, even if he personally did not discuss the specific FBAR requirements, their generated return would have, which means that failing to disclose their foreign bank accounts to Mr. Niebur was willful blindness. *See McBride*, 908 F. Supp. 2d at 1210.

Defendants not only failed — at least three times — to disclose the accounts to their tax preparer, they also concealed them from the IRS twice. When tax compliance officer Klyzek interviewed Defendants in August 2014 as part of the income tax exam, he explicitly asked them if they had any foreign bank accounts. They said no. When R.A. Cook interviewed Defendants in December 2014, Defendants finally disclosed the existence of the Iranian bank account, but only after a conversation about the Lavasan property sale as part of their income tax examination.

This eleventh hour disclosure should be given little credit, however, because it occurred after multiple instances of failing to disclose, and more importantly, it was only a partial disclosure and Defendants stood to benefit at that time. Once the IRS began an income tax exam of Defendants, the reporting of the Lavasan sale on their 2011 return became highly suspicious:

reporting a $500,000 amount realized in sale proceeds against a cost basis of $500,000 for *exactly* no gain or loss would raise suspicion because that kind of precise matching is extremely unlikely. If Defendants did not comply after the fact during the exam, they could have faced a much larger tax deficiency than they ultimately did because of how IRS exams work. The IRS can construct income in any reasonable way, often by examining bank deposits, and if taxpayers don't cooperate and provide evidence of deductions or their cost basis in property, they are not given credit for them. *See, e.g.*, *Enayat v. Comm'r*, T.C. Memo. 2009-257 at *3–4. Thus, if Defendants did not disclose more details about the sale, including the existence of the Iranian bank account and the deposit slips they had, the IRS could have taken just the gross deposits in 2011, which as discussed above exceeded $1.3 million, and given no credit for basis, resulting in a gain of over $1.3 million. This is much higher than the ultimate deficiency resulting from the exam. *Cf. Rum*, 995 F.3d at 891 (revealing details of a foreign account only when beneficial indicates willfulness).

Even more, at this meeting, Defendants only disclosed some of their foreign accounts and were still not entirely honest. After learning about the existence of the Iranian account, Cook repeatedly asked if Defendants had disclosed all their foreign bank accounts, and they repeatedly failed to disclose the Canadian accounts. Defendants therefore had multiple opportunities to reveal the existence of their foreign accounts in response to in-person questioning, and they repeatedly failed to do so.

### 3. *Defendants did not inquire about FBAR reporting requirements.*

Defendants met at least three times with Mr. Niebur to prepare and sign their tax returns. Not once did they ask him about the tax implications of a valuable property sale in the "Beverly Hills" of Iran or of owning and maintaining foreign bank accounts. They also retained an

attorney specializing in OFAC licenses and dealing with foreign assets. Not that Ms. Yazdanyar would necessarily have FBAR answers, but Defendants never asked her about any tax or reporting requirements resulting from the OFAC license authorizing them to move money from a private Iranian bank account.

Failing to take advantage of these professionals they worked with is willful blindness and reckless. *Ott*, 441 F. Supp. 3d at 530–31; *Schwarzbaum*, 2020 WL 1316232 at \*7 (quoting. *Williams*, 489 F. App'x at 658). Failing to do their own research under the circumstances was also willfully blind and reckless. Neither Defendant ever visited any IRS or Treasury websites to inquire about either FBAR reporting requirements or the taxation of foreign property sales despite being conscious of the fact that they were not experts in tax themselves. Rather, they simply assumed they did not have to pay tax on the property sale or report their foreign bank account in any way. They were aware that they did not know about these specific areas of law, so their failure to either inquire with others or do their own research are both willful blindness, particularly after receiving their OFAC license. *See id.*

Why, specifically, Defendants sought an OFAC license but did not inquire about their tax and reporting requirements is unclear,[5] but largely irrelevant to whether they willfully failed to file FBARs. The undisputed facts show that Defendants had the means to seek professional assistance when they wanted to, and they had a certain sophistication in seeking out an obscure Treasury license. But at the same time, they chose not to ask about tax or reporting requirements

---

[5] Perhaps they did so because there are potential criminal sanctions punished by imprisonment for violating the U.S. sanctions against Iran, so they wanted the double benefit of protection from that liability while also trying to avoid paying taxes. Regardless, the Court need not speculate.

related to their foreign accounts despite having many opportunities to do so — they repeatedly exchanged emails with the law office they had already paid, and they met with their tax preparer in person. Not only did they fail to seek out advice, but they repeatedly thwarted it by concealing their foreign accounts from their preparer. In short, they were selective as to what they disclosed and inquired about, and specifically did so only when there was a clear benefit to them, which is a hallmark of willful blindness. *See Horowitz*, 978 F.3d at 82–83 (not discussing the tax implications of foreign activity with an accountant is reckless or willful blindness).

    This is even more true in this case because the OFAC license itself should have put Defendants on notice to inquire more or do further research about FBAR requirements. Paragraph 5 of the license said it did not excuse compliance "with any law or regulation . . . including reporting requirements . . . applicable to the transactions" covered by the license. Section 3(c) of the license said the license "should not be interpreted to excuse the Licensees from compliance with other laws, regulations, orders or rulings to which they may be subject." Neither Defendant asked the attorney they retained for this specific purpose what other reporting requirements or laws and regulations their Iranian bank account and Lavasan property sale might subject them to. And they did none of their own research on the matter.

    Lastly, Section 4 of the license specifically directed Defendants to comply with certain recordkeeping and reporting requirements of Title 31, which is the same title containing FBAR requirements. Neither Defendant ever asked anyone what those reporting and recordkeeping requirements were. Even though the Title 31 requirements referenced in Section 4 may have differed from the separate FBAR requirements, Defendants' failure to review the license in depth and ask about compliance with it evinces a reckless disregard as to the many recordkeeping and reporting requirements arising from their foreign accounts, of which their FBAR requirements

were one part. They were effectively willfully blind to the many issues raised by their OFAC license. Any amount of inquiry into any of the prompts from the license could have easily informed them about the FBAR requirements.

The undisputed facts show that Defendants had these many prompts to inquire further about their foreign account reporting requirements, either of others or on their own, but they consistently chose not to. Such undisputed circumstances would put a reasonable person on notice that they were at risk of not complying with a legal requirements, and Defendants were reckless not to inquire about them.

### 4.  *The FBAR statute does not authorize a reasonable cause defense.*

To the extent Defendants raise a defense to liability based on reasonable cause, such defense fails as a matter of law for two primary reasons. First, by statute, Defendants do not have a reasonable cause defense for their *willful* FBAR penalties. *See* 31 U.S.C. § 5321(a)(5)(C)(ii). Second, they cannot meet the elements of reasonable cause based on the undisputed facts in this case.

When applied in other tax penalty contexts, a "reasonable cause" defense exists when a taxpayer exercises "ordinary business care and prudence" or the taxpayer acted in "good faith" with respect to the penalty. *Jarnagin v. United States*, 134 Fed. Cl. 368, 376 (2017). Generally, the most important factor is "the extent of the taxpayer's effort to assess the taxpayer's proper tax liability." 26 C.F.R. § 1.6664-4(b). Relying on a tax professional can, under the right circumstances, provide such a reasonable cause defense, but the taxpayer must provide the professional with "full details." *Id.* Retaining a tax professional but failing to request any advice will deprive a taxpayer of a reasonable cause defense. *See, e.g.*, *Jarnagin*, 134 Fed. Cl. at 378 (failure to ask a tax professional about foreign bank accounts deprived the taxpayers of a

reasonable cause defense to their *non*-willful FBAR penalties). And in general, a taxpayer who does not disclose all relevant facts to a professional is not entitled to a reasonable cause defense. 26 C.F.R. § 1.6664-4(c)(i); *Cohen v. United States*, 999 F. Supp. 2d 650, 675 (S.D.N.Y. 2014).

In this case, Defendants cannot rely on a reasonable cause defense no matter which professional they may claim to have used. First, they did not disclose all the relevant facts to their tax preparer, Mr. Niebur, and particularly the most important fact: that they owned foreign bank accounts. In response to a clear question about them, they outright denied having any foreign accounts. Second, to the extent Ms. Yazdanyar qualifies as a professional with regard to foreign accounts, Defendants still did not disclose the accounts in procuring the OFAC license. While the OFAC license indeed permitted use of a private Iranian bank account, it expressly informed Defendants that its scope was limited only to the moving of money and did not substitute for other reporting requirements.

Furthermore, despite retaining experts, Defendants never asked the experts about their foreign bank accounts and any tax or reporting requirements related to them. As discussed above, Defendants spent significant effort moving money to and from their foreign accounts and selling the Lavasan property, and they had every reason to inquire about any additional requirements. By their own admission, they never asked anyone about any reporting or tax requirements related to their accounts, so they are not entitled to a reasonable cause defense. *See Jarnagin*, 134 Fed. Cl. at 378.

## VI. CONCLUSION

Defendants concealed the existence of their foreign bank accounts from their tax preparer and the IRS on multiple occasions. Doing so was part and parcel of underreporting their taxable income, exactly the kind of wrongdoing the BSA was meant to combat. They also failed to ever

inquire about any reporting requirements despite being sophisticated business owners and having many reasons to inquire and multiple opportunities to do so. Their behavior was at least reckless and therefore willful under the statute, and the United States is entitled to summary judgment finding that the assessment of the willful FBAR penalties for 2011 to 2013 against them is proper. The Court should grant this motion finding Defendants were willful, and then schedule briefing on the IRS's calculations and the amount of the penalties.

Respectfully submitted on April 22, 2022.

DAVID A. HUBBERT
Deputy Assistant Attorney General

/s/ *Alexander Stevko*
ALEXANDER E. STEVKO
TY HALASZ
Trial Attorneys, Tax Division
U.S. Department of Justice
*Counsel for the United States*