Bear Wilner-Nugent, OSB #044549
Bear Wilner-Nugent, Counselor and Attorney at Law LLC
620 SW 5th Avenue, Suite 1008
Portland, Oregon 97204
Phone: (503) 351-2327
Fax: (503) 914-6665
Email: bwnlaw@gmail.com
Attorney for Defendants Ali Mahyari and Roza Malekzadeh

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION


UNITED STATES OF AMERICA,              No. 3:20-CV-01887-BR

               Plaintiff,      **DEFENDANTS' MEMORANDUM OF LAW**
**IN OPPOSITION TO PLAINTIFF'S MOTION**
    v.                             **FOR SUMMARY JUDGMENT**

ALI MAHYARI and
ROZA MALEKZADEH,

              Defendants.


    Defendants Ali Mahyari and Roza Malekzadeh, through counsel, respectfully oppose

plaintiff United States of America's motion for summary judgment. The government is generally

correct about both the scope of the issues for decision and the prevailing legal standards. But the

government repeatedly misapprehends the conceptual gap between those standards — favorable

to the government's case as they are — and the extent to which defendants' conduct and mental

state remain open to multiple factual interpretations. The government's sinister portrait of

defendants is painted from an advocate's perspective, not a factfinder's.

DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT – Page 1

Viewing the relevant facts in the light most favorable to defendants as the non-moving parties, and drawing reasonable inferences therefrom, the central issue of willfulness remains in live dispute for trial. The dependent issue of reasonable cause is not foreclosed either, then. Because the government is not entitled to a judgment in its favor as a matter of law, the court should deny the government's motion.[1]

## FACTUAL BACKGROUND

Although defendants are educated professionals, they are immigrants with a limited command of English, not the sophisticated operators portrayed by the government. Defendant Ali Mahyari is 66 years old and his wife, defendant Roza Malekzadeh, is 62. Ali Dep. 12:16; Roza Dep. 9:23. Both defendants were raised in Iran and completed college-level education there. Mr. Mahyari subsequently obtained a PhD in architecture in Sydney, Australia. Ali Dep. 12:21-13:1, 14:20-15:2; Roza Dep. 10:2-10:4, 11:12-11:15.[2] Mr. Mahyari and Ms. Malekzadeh left Iran in approximately 1990 in order to ensure that their sons were not subject to mandatory conscription into the Iranian Army. Ali Dep. 17:16-18:1.

Farsi is defendants' primary language. They often struggle with English, especially when encountering complex, technical language or issues. Both defendants have missed many opportunities for professional advancement and work experience in the United States because

---

[1] The parties' proposed briefing schedule, which the court adopted, originally envisioned that defendants would cross-move for summary judgment in conjunction with filing this response. Defendants have concluded that they are not in a position to file such a cross-motion. Defendants thus intend this opposition to the government's summary judgment motion, as supported by defendants' supplemental exhibits, to constitute the entirety of their summary judgment briefing.

[2] To aid the court's review of the deposition transcript excerpts that the parties have submitted, defendants have adopted the government's system of transcript references. The government and defendant have each submitted their own set of transcript excerpts, but, to be clear, they are excerpts from the same transcripts of the same depositions.

DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT – Page 2

their limited English proficiency prevented them from meeting employer expectations in a professional architecture office setting. Mr. Mahyari earned his PhD at the University of Sydney, but he faced significant challenges learning the English language during the six years he was enrolled in his doctoral program. His graduate school instructors regularly advised him that his English skills were weak and he needed to improve his command of the language. Ali Dep. 14:23-16:21. This limited English proficiency has dramatically reduced Mr. Mahyari's ability to work in a professional context and limited him to running his own business remodeling and flipping residential homes, a job requiring academic qualifications substantially less prestigious than his PhD in architecture. Ali Dep. 19:15-20:19.

Mr. Mahyari moved to the United States after he finished his PhD program. Despite his education, he was not able to secure a professional job due to his severely limited English proficiency. Ali Dep. 21:18-23. He eventually accepted a position outside his professional background working for several years as a Farsi language teacher for the Department of Defense's graduate language institute in Monterey, California. Ali Dep. 20:20-23:1. After some years in Monterey, Mr. Mahyari and Ms. Malekzadeh moved to the Portland area. Mr. Mahyari eventually went into business remodeling and flipping residential properties. This arrangement allowed him to earn a living in a field that was related to his field of academic expertise, but he was unable to secure professional employment as an architect commensurate with his academic background and professional experience working in Iran.

Mr. Mahyari has been able to maintain his home renovation and resale business despite his limited English proficiency by devising ways to communicate with his building contractors and laborers, who are primarily Spanish speakers. Mr. Mahyari reports that "They're Mexican, I'm Iranian. We speak different languages. Somehow we get along." Ali Dep. 24:16-25:19.

When he is required to review complex English-language documents like permits or legal materials, Mr. Mahyari enlists the help of his brother Danny, who has been in the United States for approximately twice as long as him, and who has a better command of English. Mr. Mahyari consults with Danny at least two to three times per week about business and language-related matters. Ali Dep. 31:18-32:22.

Ms. Malekzadeh has also experienced similar difficulties with mastering the English language and finding and maintaining employment since moving to America. Ms. Malekzadeh has assisted Mr. Mahyari with his home remodeling business over the years, but she has also worked for several businesses as an architectural drafter, including MacKenzie, Inc., the TDA Group, the Bonneville Power Administration, and the City of Portland. Roza Dep. 13:9-13:13; 15:19-16:16. Ms. Malekzadeh reports that these jobs have not always gone smoothly. She was fired or terminated from her job with MacKenzie and TDA after working at each location for approximately 18 months.

Ms. Malekzadeh's limited English skills were the primary reason she was terminated from her employment at those companies and at the BPA, where she lasted approximately 3 years. Ms. Malekzadeh was subsequently able to secure a position with the City of Portland's Bureau of Development Services, which she has held since 2017. Roza Dep. 15:19-16:4, 16:17-17:7; 18:9-19:20. Ms. Malekzadeh reports that her supervisors at the Bureau of Development Services have often identified significant concerns with her limited English skills during performance evaluations, but the City of Portland's focus on workplace diversity and heightened consciousness about protected class discrimination has allowed her to retain her job and find better overall job security than she experienced in the private sector. Roza Dep. 19:21-20:9.

Like many other immigrants who came to the United States well into their adult lives, Ms. Malekzadeh and Mr. Mahyari experienced significant difficulties adjusting to the American way of life. In addition to making do with their limited English skills, defendants had to understand and navigate many basic legal and tax concepts that are almost second nature to most adult Americans. Ms. Malekzadeh first filed a Federal tax return in 2001 after enlisting the help of a local librarian, who walked her through the process of reviewing wage statements and receipts to generate a simple IRS 1040 return. Ms. Malekzadeh reported that the process of filing taxes "was such a new concept in my life." Roza Dep. 46:16-47:7. After that experience, Ms. Malekzadeh became primarily responsible for handling defendants' tax preparation and filing, along with other essential aspects of the family's financial life. Roza Dep. 39:23-40:13.

In subsequent years, especially after Mr. Mahyari began running his own business that involved buying and selling real property, Ms. Malekzadeh began relying on paid tax preparers to complete and file the couple's tax returns. Ali Dep. 26:22-27:10; Roza Dep. 39:23-40:13. The couple's limited command of English and relative unfamiliarity with the complexities of American tax law left them entirely reliant on professional tax preparers, and the couple came to trust those professionals to understand and handle all tax-related matters in their lives. Defendants provided whatever information their preparers requested and signed the finished returns their providers set in front of them. Ali Dep. 26:22-27:10, 27:18-28:12, 56:3-56:9, 60:17-61:2, 82:21-83:1, 84:14-84:17, 94:15-96:7; Roza Dep. 49:2-51:15.

Mr. Mahyari and Ms. Malekzadeh have a long track record of reliance on professionals like paid tax preparers and attorneys for advice about issues like legal and tax compliance. Defendants were dependent on the advice of these professionals when handling the sale of their property in Iran because of their extremely limited knowledge of the complexities of American

tax law and because they did not personally understand the complexities of navigating a large international financial transaction. Ali Dep. 56:3-56:9. Defendants also did not have knowledgeable friends or confidantes with whom they could discuss these matters and as a result they did not truly understand that they were well out of their depth during this process. Ali Dep. 96:12-96:16.

During the process of selling their home in Iran in early 2011, Mr. Mahyari and Ms. Malekzadeh found themselves ensnared in the complex web of US law regulating financial transactions which occur in Iran. Because they were unaware of the full operation and effects of the legal sanctions the United States had imposed against Iran, defendants were easily able to arrange for the sale of the property, but soon thereafter learned that they could not readily take the profits of that sale out of Iran and back into the United States. Ali Dep. 58:13-59:7, 74:12-74:19. They initially cast about for an easy, self-directed solution, which in their case involved opening a Canadian bank account and attempting to transfer the funds into Canada. Ali Dep. 73:11-73:16, 74:11-74:24.

They soon learned that this plan would not work. Thereafter, they retained attorney Mehrnoush Yazdanyar, who advised them how to comply with US law and request an Office of Foreign Assets Control (OFAC) license for the proceeds of their home sale. By this time, the sales process was already well underway. Ali Dep. 64:25-65:11, 74:11-75:24, 78:1-83:1. Ultimately, Ms. Yazdanyar also failed defendants in a key respect, in that she failed to provide them with information about foreign bank account (FBAR) reporting or the consequences of non-compliance. Ali Dep. 86:7-86:19, 87:20-24.

Mr. Mahyari and Ms. Malekzadeh began working with professional tax preparer David Niebur in 2006. Mr. Niebur is an enrolled agent and Oregon state licensed tax consultant, but he

is not an accountant. Niebur Dep. 13:9-19. In the years between 2005 and 2010, defendants' tax returns were relatively simple, straightforward affairs. Mr. Niebur was able to handle these returns without error. Roza Dep. 50:8-50:12.

Ms. Malekzadeh would meet with Mr. Niebur once per year during tax season and would bring him a stack of relevant documents, then would ask him to review the materials and prepare tax returns for the couple. Roza Dep. 49:5-49:8. Mr. Niebur did not ask her to complete written tax questionnaires or planners during this process. He did not employ a Farsi interpreter or maintain other potential methods of ensuring adequate communication about complex tax issues with her. Roza Dep. 49:14-49:17, 50:8-50:12. Instead, he would ask a series of oral questions which were tied to computer prompts generated by his tax software package. Niebur dep. 25:17-25:25.

Ms. Malekzadeh felt that because they had employed Mr. Niebur since approximately 2006, he was well-acquainted with their family situation and financial position, which led her to completely trust him and his work. Roza Dep. 51:5-51:10. Mr. Niebur would generally ask Ms. Malekzadeh for information about a specific tax-related subject and she would hand him whatever documents or materials were relevant to his questions. Roza Dep. 51:11-51:15. Unfortunately, Mr. Niebur ultimately failed to ask Ms. Malekzadeh questions about important financial and tax issues and did not follow up with defendants to ensure that they understood the process or had given accurate information during their meetings. Roza Dep. 58:7-58:25.

The overall complexity of defendants' tax situation changed dramatically in 2011, after defendants sought to sell their home in Lavasan, Iran.[3] Ms. Malekzadeh first informed Mr.

_____

[3] The government endeavors to baselessly attempts to portray defendants' home as a lavish luxury property, MSJ at 3-4, but it was simply a single-family home in a relatively decent part of the very economically diverse city of Tehran — exactly what would be expected from a family of middle-class professionals with a track record of working in professional capacities for large

Niebur about their efforts to sell their home in Lavasan at the outset of their professional relationship in 2006. She brought the matter up again when they began efforts to transfer the proceeds of the property sale from Iran to the US in 2011. Roza Dep. 55:1-55:7. During their 2011 tax season meeting, Ms. Malekzadeh showed Mr. Niebur a copy of the couple's OFAC license, Exhibit 16, and told him that they maintained Iranian bank accounts. Roza Dep. 60:13-61:9. Ms. Malekzadeh believed that, because Mr. Niebur was well aware of the sale of their property in Iran, he would inform them of any tax or legal obligations they needed to heed. Roza Dep. 72:13-72:24. Mr. Niebur was also the one who chose to declare $500,000 in proceeds from the Lavasan home sale and to report a basis of $500,000, leaving exactly no capital gains or losses. Roza Dep. 73:18-73:21; Ali Dep. 98:19-99:14.

Defendants only became aware of how many errors Mr. Niebur had introduced into their tax returns after the Internal Revenue Service initiated an audit and assessed nearly $100,000 in capital gains taxes for profit realized on the sale of their Lavasan home. This audit was a wakeup call for defendants. They quickly stopped working with Mr. Niebur, hired a certified public accountant, and begin attempting to address financial mess left in Niebur's wake. Ali Dep. 99:25-100:13. Unfortunately, it was too late to undo the damage caused by their reliance on Niebur's work on their behalf.

When defendants met with IRS revenue agent Joshua Cook during their 2015 audit, they were open and forthcoming about all of the issues relating to their Lavasan home sale and subsequent remission of sale proceeds to the United States. Mr. Mahyari repeatedly expressed

---

Iranian companies. Defendants surrendered much of that earning capacity when they left Iran, leaving this property as their one major nest egg. Defendants have not sold other property in Iran, do not own other properties in Iran, and do not have significant assets beyond the house outside the US. This is not consistent with government's attempts to paint defendants as sophisticated and wealthy professionals who are attempting to game the American tax system.

DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT – Page 8

confusion about his tax obligations and FBAR reporting requirements. He even asked Agent

Cook if he needed to file additional reports regarding his foreign accounts or if his disclosure at

their meeting satisfied that obligation. Ex. 101 (Ali Interview Notes) at 1-6.

Ms. Malekzadeh similarly expressed a naïve belief that defendants had met all their tax

and reporting obligations. She also told Agent Cook that, after Mr. Mahyari's interview led the

couple to determine that additional FBAR reporting was required, she attempted to comply with

those requirements by filing online FBAR reports. Ex. 102 (Roza Interview Notes) at 1-4. Ms.

Malekzadeh further informed Agent Cook that she had trusted Mr. Niebur to understand the

couple's tax obligations and reporting requirements and that Mr. Niebur did not ask her about

foreign accounts or foreign assets during their tax season meetings. *Id.* Both Ms. Malekzadeh

and Mr. Mahyari expressed surprise and confusion about a number of IRS rules and

requirements relating to their tax obligations during their meetings with Agent Cook.


## LEGAL STANDARDS AND ISSUES FOR DECISION

Summary judgment is only appropriate when there is no genuine dispute as to any

material fact at issue between the parties and when the undisputed factual predicates entitle the

moving party to judgment as a matter of law. Fed. R. Civ. P. 56(a). It is the moving party's task

to show the absence of any genuine issue of material fact as an initial matter. *Celotex Corp. v.

Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Even if the moving party

can accomplish that, the non-moving party may still produce contrary evidence to demonstrate

that issues of fact remain. *Id.*; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 474 U.S. 574,

587, 106 S. Ct. 1378, 89 L. Ed. 2d 538 (1986). The government's burden is to establish by

"significantly probative" evidence every element of its claim that defendants willfully violated

the FBAR reporting requirement. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249-250, 252,

106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). In determining whether the government has met that

burden, the court must view the evidence in the light most favorable to defendants and must

draw all reasonable inferences from it in defendants' favor. *Clicks Billiards Inc. v. Sixshooters

Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001).

   For purposes of this memorandum, and as a legal matter, defendants agree with the

government about the applicable substantive provisions of the Bank Secrecy Act and the

elements of an FBAR penalty claim for a willful violation of the law. *See* MSJ at 13-14 (citing

31 U.S.C. §§5314 and 5321; 31 C.F.R. §§1010.350, 1010.306(c); and *Jones v. United States*, No.

19-CV-4950, 2020 WL 4390390 at *5 (C.D. Cal. May 11, 2020)); *see also United States v.

Pomerantz*, No. C16-689 MJP, 2017 WL 4418572 at *2 (W.D. Wash. Oct. 5, 2017). Defendants

additionally agree that the undisputed evidence demonstrates that they did not timely file FBARs

for the years at issue despite being United States citizens controlling qualifying foreign bank

accounts, which means that the government could prevail at trial if it were able to adduce

admissible evidence that defendants' omissions were willful. *See* MSJ at 14-15; *Jones*, 2020 WL

4390390 at *5; *Pomerantz*, 2017 WL 4418572 at *2. Finally, defendants concede that the

prevailing view among the reported cases on point permits the government to hold taxpayers

liable for willful violations of the pertinent FBAR reporting requirements when the taxpayers

recklessly disregard those requirements. *See* MSJ at 15-16. "[W]here willfulness is a statutory

condition of civil liability, we have generally taken it to cover not only knowing violations of a

standard, but reckless ones as well." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 57, 127 S. Ct.

2201, 167 L. Ed. 2d 1045 (2007); *see also United States v. Bohanec*, 263 F. Supp. 3d 881, 888-

889 (C.D. Cal. 2016) (holding that willfulness under 31 U.S.C. §5321 can be shown through

evidence of "reckless disregard of a statutory duty").

Despite this significant narrowing of the issues, it remains important to avoid understating the height of the legal hurdle that the government has set for itself in this case. The government recites that "recklessness is an 'objective standard.'" MSJ at 16 (quoting *Safeco*, 551 U.S. at 68). It points out that it has been able to win cases in other circuits before under that standard. MSJ at 16 (citing *United States v. Rum*, 995 F.3d 882 (11th Cir. 2021); *United States v. Horowitz*, 978 F.3d 80, 88 (4th Cir. 2020); *United States v. Goldsmith*, 541 F. Supp. 3d 1058 (S.D. Cal. 2021); and *Kimble v. United States*, 141 Fed. Cl. 373, 389 (2018), *aff'd*, 991 F.3d 1238 (Fed. Cir. 2021)). The government then equates willful blindness to recklessness and suggests that willful blindness, too, must be a wholly objective standard. MSJ at 16-17 (citing *United States v. McBride*, 908 F. Supp. 2d 1186, 1205 (D. Utah 2012); *Global-Tech Appliances Inc. v. SEB S.A.*, 563 U.S. 654, 766 (2011); and *United States v. Williams*, 489 F. App'x 655, 658 (4th Cir. 2012).

Defendants disagree as to this last, crucial legal point. Defendants' deposition testimony (which was elicited by the government's own examination), defendants' recorded remarks to the examining revenue agent, and the prelitigation written record of defendants' business dealings must all be considered in the light most favorable to defendants, and with all reasonable inferences drawn in defendants' favor. "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. This principle requires the court to accept the defendants' representations as credible at this stage of the litigation. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.*

Determining whether defendants were willfully blind or, conversely, less blamefully

naïve, inevitably requires making subjective determinations about their credibility. "A

determination of willfulness requires an assessment of a defendant's state of mind." *F.T.C. v.*

*Network Servs. Depot Inc.*, 617 F.3d 1127, 1139 (9th Cir. 2010)*; see also Strickland v. Norfolk S.*

*Ry. Co.*, 692 F.3d 1151, 1154 (11th Cir. 2012).

> Questions involving a person's state of mind, e.g., whether a party knew or should have
> known of a particular condition, are generally factual issues inappropriate for resolution
> by summary judgment. *See* 10A C. Wright, A. Miller & M. Kane, *Federal Practice and
> Procedure* §§ 2729-2730, at 229, 238 (2d ed. 1983). However, where the palpable facts
> are substantially undisputed, such issues can become questions of law which may be
> properly decided by summary judgment. *See Fonda v. Gray,* 707 F.2d 435, 438 (9th Cir.
> 1983). But summary judgment should not be granted where contradictory inferences may
> be drawn from such facts, even if undisputed. *United States v. Perry,* 431 F.2d 1020,
> 1022 (9th Cir. 1970).

*Braxton-Secret v. A.H. Robins Co.*, 769 F.2d 528, 531 (9th Cir. 1985); *see also Network Servs.*,

617 F.3d at 1139 (reaffirming principle from *Braxton-Secret* a quarter-century later). In this case,

multiple significant inferences can readily and rationally be drawn from defendants' conduct to

demonstrate that there remains a live question as to their culpable state of mind.


## ANALYSIS

The government attempts to portray Mr. Mahyari and Ms. Malekzadeh as sophisticated

professionals who willfully attempted to game the system and dodge tax compliance obligations,

but the available evidence does not unilaterally support such a characterization. Defendants'

situation is amenable to a much more mundane interpretation than the government's caricature:

they are well-educated immigrants who came to the United States late in life and have faced

significant barriers adjusting to American laws and practices and becoming proficient in the

English language. Like many immigrants in their shoes before them, they have learned — now, it

seems, at their peril — to place enormous trust in professionals who are knowledgeable about the

dynamics of legal and tax systems that can be utterly inscrutable and alien to individuals who grew up and were educated in a society with radically different customs and expectations from our own.

In retrospect, it is easy to criticize defendants' reliance (if not dependence) on their tax preparer, and their failures to independently investigate aspects of their tax situation, but their decisions can only be fully understood in the overall context of their personal and professional lives. Mr. Mahyari and Ms. Malekzadeh have consistently struggled to learn enough English to function in complex professional environments. They have found the American system of tax laws and regulations to be confusing, foreign, and effectively impenetrable. In his deposition for this case, Mr. Mahyari reported his amazement with the concept that he could claim a tax break for capital losses on sales of gold and silver, explaining that such a system "was a new concept altogether for me" and was unheard of in his native Iran. Ali Dep. 114:24-115:6. Defendants have had many similar realizations about the intricacies of American tax laws over the years, including the need to obtain an OFAC license to move the proceeds of the sale of their Lavasan house out of Iran and the need to file FBAR reports disclosing funds held in foreign bank accounts.

After they arrived in the United States, defendants were often faced with the task of navigating many complex and unfamiliar legal and tax systems that would seem commonplace to many adult Americans who grew up in this country. Ms. Malekzadeh had to enlist the assistance of a local librarian in order to file her first Federal income tax return in 2001, even though her return was quite simple in comparison to those of many other taxpayers. Ms. Malekzadeh reported that the experience "was such a new concept in my life." Roza Dep. 46:25. In subsequent years, Ms. Malekzadeh took over primary responsibility for meeting with tax

preparers and ensuring defendants' compliance with American tax laws, likely because she was somewhat more comfortable with communicating in English than Mr. Mahyari. It is much easier to understand why immigrants with limited English skills and little knowledge of the intricacies of the American tax system would be legitimately unaware of their FBAR reporting requirements and be entirely dependent on their paid tax professional to identify and comply with extremely technical tax issues like FBAR reporting.

While putting such substantial trust in tax and legal professionals does not by any means exempt defendants from legal obligations like knowing and being responsible for the contents of their tax returns, it plainly undermines, in the summary judgment context, the government's argument that defendants were reckless, or willfully blind, with regard to their duty to comply with FBAR reporting requirements. Defendants placed great trust in their tax preparer, Mr. Niebur, with whom they developed a long-term relationship, and who knew a great deal about them and their background. The government has not adduced any evidence that defendants had relatives, friends, or professional associates with a sophisticated understanding of the FBAR reporting obligations to whom they could turn for independent advice about their obligations. Like many immigrants with limited background knowledge of the American legal system, they were not readily aware that the professionals they paid and trusted could fail to give them accurate advice or that they could still be held personally liable for extremely large penalties for seemingly-minor issues like disclosing foreign bank accounts even after they thought they had fully entrusted those issues to the professionals.

At the outset of his work for defendants, Mr. Niebur knew or should have known that they were both recently naturalized citizens with substantial barriers to speaking and understanding English, particularly difficult and technical concepts like those found in tax law.

Professional standards require that individuals in Mr. Niebur's position take special care when working with individuals in defendants' position and provide extra guidance and oversight because individuals like defendants are often unable to fully understand the complexities of the laws and rules that apply to them. *See e.g.* 31 C.F.R. §§10.22(a), 10.33(a)(2)-(3). Mr. Niebur arguably violated those applicable professional standards, and his overall duty to take care of the matters that defendants had entrusted to him, by failing to conduct any appropriate investigation into defendants' tax issues, and by either affirmatively providing bad information to the IRS or by being so obtuse toward defendants' mistakes and naïve assumptions that he allowed defendants to report obviously incorrect information that no reasonable tax professional would ever permit.

One of the fundamental questions at the heart of this case is whether and how Mr. Niebur asked defendants about the existence of their foreign bank accounts. The government has indicated that Mr. Niebur's assertion that he did indeed ask defendants about those accounts is credible because he was able to quickly recite the language of that question from memory during his deposition and because his tax software would have generated a prompt requiring him to input a response about the issue before the software would generate a return. *See* MSJ at 20, 27. In actuality, this is a much thinner reed than the government attempts to portray.

Since 2011, Mr. Niebur now has the benefit of an additional decade of professional tax preparation experience under his belt, giving him a much better opportunity to know and recite the kinds of questions he asks during a tax preparation meeting. He is also unable to offer any independent confirmation that he asked the question beyond his simple assertion that he must have done so because he always does for everyone else. Niebur Dep. 25:17-25. At best, the only proof of the matter is Mr. Niebur's bare assertion about a single question he asked in a single

meeting over a decade ago during a busy tax preparation season in which he likely interviewed hundreds of clients about a wide array of issues.

Ms. Malekzadeh reports that Mr. Niebur was already well aware of their family and professional lives, and it would have been reasonable for her to assume that someone in Mr. Niebur's situation would have taken independent initiative to connect pre-existing knowledge of an issue like the sale of defendants' Lavasan home with the tax and reporting obligations imposed upon taxpayers in such a situation. More specifically, Ms. Malekzadeh testified that Mr. Niebur was well aware of defendants' ongoing efforts to sell their Lavasan home and their use of Iranian bank accounts to hold house sale proceeds, as she had discussed these topics with him in the years leading up to the meeting when Mr. Niebur prepared defendants' 2011 tax return. Roza Dep. 72:1-24. Instead, at that meeting Mr. Niebur merely marched through a rote list of questions triggered by his tax software and completely failed to conduct any kind of follow-up once he asked a single question about foreign bank accounts and received a single negative response.

Mr. Niebur also asked his single question regarding foreign bank accounts in an unnecessarily confusing, verbose way, inquiring whether defendants had an ownership interest or signatures on any foreign bank, trust, or brokerage accounts instead of simply asking if defendants still had any bank accounts in Iran or other countries. Niebur Dep. 74:3-74:6. While the difference between the two formats of this question may seem minor to native English speakers with professional backgrounds, it is much harder for someone with limited language proficiency to tease apart the inherent technical jargon and understand what is actually being asked of them. Even if Mr. Niebur had asked a more straightforward version of his question about foreign bank accounts, he still should have had enough prior and contextual knowledge

about defendants' lives and activities to question a negative response and dig deeper into the matter before moving on from the topic. Instead, considering the evidence in the light most favorable to defendants, he asked a rote question, received a confused, negative response, and thoughtlessly marched along to his next rote question without making even a token attempt to ensure that he had received an accurate picture of defendants' financial lives. Such utter incuriosity, especially after having prior knowledge about defendants' home sale and use of Iranian bank accounts, is a complete dereliction of Mr. Niebur's professional duty to defendants. It would be considered legal malpractice if it were committed by an attorney.

The government additionally asserts that defendants actively chose to declare $500,000 in proceeds from the Lavasan home sale and to report a basis of $500,000, leaving exactly no capital gains or losses. Defendants have unequivocally stated that Mr. Niebur was the actual architect of this plan, however, and common sense supports defendants' version of events. Roza Dep. 73:18-22. Reporting a wash sale with exactly zero capital gain or loss is so obviously incorrect and so easily flagged that it seems much more likely to be a mixup or misunderstanding than a conscious attempt to defraud.

In the light most favorable to defendants, no sophisticated scam artist would undertake a plan that would be so obvious on even casual inspection. The capital gains reporting issue, rather, supports defendants' assertion that Mr. Niebur did not have the numbers available, did not want to undertake the effort required to get those numbers, and therefore simply wrote in two arbitrary figures there and assured defendants that they could come back and amend the return later once the real numbers were easily available. Defendants were not sophisticated enough to understand that this approach was dangerous and caused them to make false statements on their tax returns. Instead, they trusted Niebur's professional expertise and did not know enough to

question whether this was a bad idea.

Ms. Malekzadeh testified that she was completely unaware of why the $500,000 figure appeared on defendants' tax return and that she provided Mr. Niebur with accurate information about the original sale price of the Lavasan home. Mr. Niebur's deposition testimony about the issue was unclear. He failed to provide a solid answer for why he reported the $500,000 sale price and cost basis or where those figures came from, instead stating that he did not recall why he used the sale price and cost basis figures that appeared on defendants' return. Mr. Niebur did not provide any solid rationale for using those figures except claiming that Ms. Malekzadeh directly reported the figures to him during their meeting. Mr. Niebur also failed to review written documentation about the home sale or ask follow-up questions concerning exchange rates that would have triggered an enhanced responsibility to investigate defendants' answers. Niebur Dep. 48:7-50:12. Again, it is not clear why Mr. Niebur failed to ask additional questions or conduct enough independent investigation to assure himself that this answer was accurate, especially when presented with such suspiciously round figures supported by nothing more than his client's bare assertion, even when he was used to reviewing the copious documentation Ms. Malekzadeh presented to him each year.

Defendants' assertions about their good-faith attempts to understand and comply with confusing US tax laws are supported by the records of their 2015 audit interviews with revenue agent Cook. Both of defendants' interview records show their ample confusion about American tax and reporting requirements, including one instance where Mr. Mahyari directly asks Agent Cook if his disclosure of the couple's foreign bank accounts during the audit interview was sufficient to meet the government's FBAR reporting requirements or whether additional action would be required. More generally, defendants were broadly open and honest during their audit

interviews, freely disclosing their foreign bank accounts to Agent Cook and making no effort to hide or obfuscate issues where their honest responses would trigger potentially ruinous civil or criminal liability.

To sum up, there are multiple obvious disputes about material facts apparent on the face of the record. Mr. Niebur claims that he never saw a copy of defendants' OFAC license, but Ms. Malekzadeh states that she provided him a copy of that document during their tax preparation meeting. The court must accept Ms. Malekzadeh's representation for the purpose of summary judgment. Mr. Niebur asserts that he was completely unaware of defendants' Lavasan property or their efforts to sell that property. This, though, directly contradicts Ms. Malekzadeh's report that she kept him informed about that process throughout the period they were selling it and attempting to bring the sale proceeds into the US.

Summary judgment is also inappropriate in this case because many of the central disputes about material facts boil down to simple he-said, she-said disagreements about whether defendants or Mr. Niebur took certain actions or provided certain information. Defendants state that they made Mr. Niebur well aware that they were selling their home in Iran and using foreign bank accounts to hold the proceeds of that sale. Mr. Niebur denies ever being made aware of that information during his meetings with Ms. Malekzadeh. Similarly, Mr. Niebur's testimony about how and when he asked about defendants' foreign accounts is also unsupported by any objective evidence beyond his own assertions about the matter. Defendants also squarely deny telling Mr. Niebur to use the $500,000 home sale capital gain and cost basis figures, while Mr. Niebur claims that defendants provided that information to him.

At their root, all of these disputes require fundamental credibility determinations to resolve. To reiterate, federal courts have upheld the proposition that credibility determinations

are decisions that must be left to a factfinder. The court should not grant summary judgment when key disputes require a jury to make decisions about witnesses' reliability or truthfulness. *Anderson,* 477 U.S. at 24; *Freeman v. Arpaio*, 125 F. 3d 732, 735 (9th Cir 1997); *see also Strickland,* 692 F.3d at 1154. Because these critical and contested issues require a factfinder to weigh the evidence and make credibility determinations about witnesses and witness testimony, summary judgment is simply not appropriate in this case.

If nothing else, government's summary judgment argument improperly overrelies on adopting the government's view of defendants' statements. Because the evidence can readily be viewed to support a theory of excusable ignorance, rather than willful blindness, however, summary judgment is inappropriate. Finally, because the issue of willfulness remains in play, the defense of reasonable cause must remain in play as well. *See* 31 U.S.C. §5321(a)(5)(B)(ii) and (C)(ii).

## CONCLUSION

For all the foregoing reasons, the court should deny plaintiff's motion for summary judgment.

RESPECTFULLY SUBMITTED May 20, 2022.

/s/ Bear Wilner-Nugent
Bear Wilner-Nugent, OSB #044549
Attorney for Defendants
Ali Mahyari and Roza Malekzadeh

DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT – Page 20

## CERTIFICATE OF SERVICE

I hereby certify that I served the foregoing DEFENDANTS' MEMORANDUM OF LAW IN
OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT and
DEFENDANTS' EXHIBITS on Alexander E. Stevko and Ty Halasz, Esqs., attorneys for
plaintiff United States of America, via CM/ECF on May 20, 2022. I further certify that Mr.
Stevko and Mr. Halasz are registered CM/ECF users.

/s/ Bear Wilner-Nugent
Bear Wilner-Nugent, OSB #044549
Attorney for Defendants
Ali Mahyari and Roza Malekzadeh

CERTIFICATE OF SERVICE