**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON**

| | |
|---|---|
| **UNITED STATES OF AMERICA**, | Case No. 3:20-cv-1887-IM |
| Plaintiff, | |
| v. | **OPINION AND ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| **ALI MAHYARI AND ROZA MALEKZADEH**, | |
| Defendants. | |

Ty Halasz and Alexander Stevko, U.S. Department of Justice, Tax Division, P.O. Box 683, Ben Franklin Station, Washington, DC 20044. Attorneys for Plaintiff.

Bear Wilner-Nugent, Counselor & Attorney at Law LLC, 620 SW 5th Ave, Suite 1008, Portland, OR 97204. Attorney for Defendants.

**IMMERGUT, District Judge.**

This action comes before this Court on Plaintiff United States of America's ("the Government") Motion for Partial Summary Judgment. ECF 15. The Government has brought this action against Ali Mahyari and Roza Malekzadeh (collectively, "Defendants") for willfully failing to file Reports of Foreign Bank and Financial Accounts ("FBARs") in 2011, 2013, and 2014, through which taxpayers are required to disclose qualifying foreign bank accounts to the Internal Revenue Service ("IRS"). The Government now moves for summary judgment on the issue of whether Defendants' failure to file FBARs was willful. A hearing on the motion was

PAGE 1 – OPINION AND ORDER

held on November 29, 2022. ECF 19. For the reasons stated on the record and for the following reasons, this Court finds that there are genuine issues of material fact regarding whether Defendants willfully failed to disclose their Iranian bank accounts in 2011. However, this Court finds that Defendants willfully failed, as a matter of law, to disclose their Iranian back accounts in subsequent years and their Canadian bank accounts for all three years at issue. Accordingly, the Government's Motion for Partial Summary Judgment, ECF 15, is GRANTED in part and DENIED in part.

## STANDARDS

A party is entitled to summary judgment if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The non-movant, in opposition to the motion, "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). The court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001). Although "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment," the "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient . . . ." *Anderson*, 477 U.S. at 252, 255. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation and quotation marks omitted).

## BACKGROUND

Defendants are an Iranian-American married couple. ECF 15 at 3. They both received degrees in architecture in Tehran, and Mr. Mahyari received a Ph.D. in architecture from Sydney University in Australia. ECF 15 at 3; ECF 16 at 2. In 2001, Ms. Malekzadeh moved to the United States. ECF 15 at 3. Mr. Mahyari followed in 2005, and both Defendants became United States citizens in 2006. *Id*.

Farsi is Defendants' primary language. ECF 16 at 2. According to Defendants, both struggle with English and have missed professional opportunities in the United States as a result. *Id*. at 2–3. While Mr. Mahyari received a Ph.D. from an English-based program in Australia, he was apparently regularly advised by his instructors that his English skills were weak. *Id*. at 3. Mr. Mahyari alleges that he has been unable to secure a job as an architect in the United States because of his limited English proficiency. *Id*. At first, Mr. Mahyari accepted a position teaching Farsi at the United States Department of Defense's graduate language institute in California, but he eventually started his own home remodeling business. *Id*. Ms. Malekzadeh has worked as an architectural drafter for MacKenzie, Inc., the TDA Group, the Bonneville Power Administration ("BPA"), and the City of Portland. *Id*. Ms. Malekzadeh alleges she was terminated from her jobs at MacKenzie, the TDA Group, and the BPA, due primarily to her limited English proficiency. *Id*. She is currently employed by the City of Portland, but alleges that her supervisors have identified concerns with her English. ECF 16 at 4. Ms. Malekzadeh was also licensed as an insurance agent and mortgage broker, both of which require passing licensing examinations administered in English. ECF 17 at 15.

### A.  Property Sale and Foreign Bank Accounts

After moving to the United States, Defendants decided to sell their property in the Lavasan neighborhood of Tehran ("the Lavasan property"). ECF 15 at 3–4. Mr. Mahyari traveled

to Iran to facilitate the sale, which was completed on May 4, 2011 for the price of 23,692,500,000 rials, or 2,369,250,000 toman, less fees and taxes, which in 2011 equated to $2,879,146.92 in United States currency. *Id*. at 4. Defendants paid Iranian taxes on the sale and started to try to move the proceeds to the United States. *Id*. at 4–5.

Defendants moved the proceeds from the Lavasan property to the United States through two avenues. First, Defendants used existing bank accounts in Canada: Defendants opened two bank accounts in Canada with the Canadian Imperial Bank of Commerce ("CIBC") sometime between 2001 and 2005. ECF 15 at 6. When Defendants were close to completing the sale of the Lavasan property, Defendants began moving assets to the United States through Canada by purchasing gold and silver bars with their CIBC accounts and having those bars sent to the United States *Id*. at 7–8. Ultimately, Defendants used the CIBC accounts to purchase over $474,000 in gold and silver between 2010 and 2011 and sell $170,577 between 2012 and 2013, sometimes using their son's name. ECF 15-6 at ¶ 23. Second, Defendants opened a series of bank accounts in Iran with Eghtestad Novin (EN) Bank to house the proceeds before moving them to the United States through a series of money exchanges. ECF 15 at 4–5, 7. However, the exchanges were subject to unpredictably high exchange rates because they were "operating in a sort of unofficial capacity to avoid existing sanctions against Iran." *Id.* at 5.

While these transfers were occurring, Defendants retained an attorney, Mehrnoush Yazdanyr, in April 2011 to procure a license from the Office of Foreign Asset Control ("OFAC") to enable them to transfer the proceeds to the United States without penalties resulting from U.S. sanctions against Iran. *Id.* at 5. Even though Defendants had already sold the Lavasan property and started transferring the proceeds, the application to OFAC indicated that the property would be sold within the next year. *Id*. OFAC issued the license on October 24, 2011. *Id*. at 5–6. The

license stated, in relevant part, that it does not "release Licensees or third parties from civil or criminal liability for violation of any law or regulation,"; that the license "should not be interpreted to excuse the Licensees from compliance with other laws, regulations, orders or rulings to which they may be subject,"; and that the "Licensees are subject to . . . recordkeeping and reporting requirements . . . ." *Id.* at 6.

In March 2012, the Society for Worldwide Interbank Financial Telecommunications ("SWIFT") cut off Iranian banks and money exchanges as part of sanctions against Iran. *Id.* At this point, Defendants had moved approximately $1,350,295 in proceeds from the sale of the Lavasan property to the United States prior to the imposition of the SWIFT sanctions. *Id.* at 5, 21. These proceeds comprised over ninety-six percent of Defendants' gross income for 2011. *Id.* at 21. After the expulsion of Iran from SWIFT, it became even more difficult to move money into the United States, and Defendants left significant assets behind in the EN accounts.[1] *Id.* at 7.

For 2011, the EN accounts had a high balance of $1,257,020 and a balance as of the FBAR filing date of $785,357. ECF 1 at ¶ 43. For 2012, they had a high balance of $897,121 and a balance as of the FBAR filing date of $726,429. *Id.* For 2013, they had a high balance of $388,652 and an unknown balance as of the FBAR filing date. *Id.* For 2011, the CIBC account ending in -2234 had a high balance of $44,621 and a balance as of the FBAR filing date of $4,653. *Id.* For 2012 and 2013, it also had a high balance of $4,653. *Id.* For 2012, the balance as of the FBAR filing date was also $4,653, and for 2013, the balance as of the FBAR filing date was unknown. *Id.* For 2011, the CIBC account ending in -5238 had a high balance of $36,873 and a balance as of the FBAR filing date of $0. *Id.* For 2012 and 2013, it also had a high balance

---

[1] Eventually, Defendants moved all of the money out of Iran after the years at issue and after the IRS began its examinations, discussed further below. ECF 15 at 8.

of $0. *Id*. For 2012, the balance as of the FBAR filing date was also $0, and for 2013, the balance as of the FBAR filing date was unknown. *Id*.

**B.  Tax Returns**

Upon moving to the United States in 2001, Ms. Malekzadeh filed her first federal income tax return by enlisting the help of a local librarian. ECF 16 at 13. In subsequent years, Defendants retained professional tax preparers. *Id*. at 5. In 2006, Defendants began employing David Niebur of Niebur's Tax Service to prepare their returns. ECF 15 at 8. Mr. Niebur is a licensed tax consultant in Oregon and an enrolled agent with the Internal Revenue Service ("IRS"). *Id*. at 8. Mr. Niebur meets with clients in person and conducts interviews as he prepares the clients' tax returns—the interviews involve asking questions prompted by his tax preparation software. ECF 16 at 7; ECF 15-4 at 5, 8. The software will not generate a return without answering each question. ECF 15 at 8. One of these questions pertains to whether the taxpayer has foreign bank accounts. *Id*. The question is: "Do you have any ownership interest or signatures on any foreign bank accounts, trusts, or brokerage accounts?" If the client answers, "yes," this prompts a follow-up question. *Id*. The follow-up question is: "At any one day during the year, did you have an accumulative balance of more than $10,000 in foreign accounts?" *Id*. at 8–9. Mr. Niebur follows this same approach to prepare every tax return and asks the same questions to every client. *Id*. at 8; ECF 15-4 at 5–6. Defendants do not dispute that Mr. Niebur used this software and concede that he asked "a series of oral questions which were tied to computer prompts generated by his tax software package." ECF 16 at 7. Ms. Malekzadeh was the one who typically attended meetings with Mr. Niebur. ECF 15 at 9. Mr. Niebur never asked her to complete written tax questionnaires or planners, nor did he employ a Farsi interpreter. ECF 16 at 7. Ms. Malekzadeh did not request or retain a Farsi interpreter for their meeting. ECF 17 at 16.

The parties present conflicting evidence regarding Ms. Malekzadeh's meetings with Mr. Niebur. The Government contends that, at the 2011 tax meeting, Ms. Malekzadeh provided a sale price and cost basis for the Lavasan property of $500,000, resulting in neither a gain nor a loss, and did not provide any supporting documents related to the sale or the OFAC license. ECF 15 at 9; *see also* ECF 15-4 at 12–15; ECF 15-13 at 10. The Government further contends that in 2011, 2012, and 2013, Mr. Niebur asked Ms. Malekzadeh the question prompted by his software regarding whether Defendants had any foreign accounts. ECF 15 at 9. Each time, Ms. Malekzadeh answered, "no," and did not ask any follow-up questions or ask for clarification. *Id*. Therefore, Mr. Niebur was not aware of the EN or CIBC accounts, and Defendants' 2011, 2012, and 2013 tax returns do not reflect those accounts. *Id*. at 9–10. Mr. Mahyari signed these returns but did not substantively review them. *Id*. at 10. Defendants never did any research and never asked anyone about their tax obligations related to their foreign accounts. *Id*. at 10, 12.

By contrast, Defendants contend that Ms. Malekzadeh first informed Mr. Niebur about their efforts to sell the Lavasan property in 2006 and brought the matter up again in 2011 when they began trying to transfer the proceeds to the United States. ECF 16 at 7–8. Defendants further contend that Ms. Malekzadeh provided accurate information about the sale price of the Lavasan property, *id.* at 18, and it was Mr. Niebur who chose to declare $500,000 in proceeds and report no capital gains or losses, *id*. at 8, 17, 18. According to Defendants, at the 2011 tax meeting, Ms. Malekzadeh informed Mr. Niebur of Defendants' use of Iranian bank accounts and showed Mr. Niebur a copy of the OFAC license. *Id*. at 8. Defendants allege that Mr. Niebur never asked about foreign accounts or foreign assets during their meetings, *id*. at 9, 15–16; *see*

*also* ECF 16-1, Ex. 101, at 5; ECF 16-2, Ex. 102, at 4,[2] and Defendants only became aware of

Mr. Niebur's errors when the IRS initiated an audit. ECF 16 at 8.

## C.  IRS Examination

In 2014, the IRS referred Defendants for an audit. ECF 15 at 10. On August 5, 2014,

Revenue Agent, then Tax Compliance Officer, Lucas Klyzek, conducted an initial interview with

both Defendants. *Id*. During this interview, Defendants were asked whether they had any foreign

bank accounts—to which they responded, "no." *Id*. On December 8, 2014, Defendants were

interviewed by another IRS officer, Revenue Agent Joshua Cook, who was assigned to review

Defendants' 2012 and 2013 tax returns. *Id*. During this interview, Mr. Mahyari told Agent Cook

that Defendants owned property in Iran, sold it for $2,000,000, transferred some money to the

United States before the sanctions made it too difficult, and still had around $400,000 in an

Iranian bank account. *Id*. at 10–11. Agent Cook asked Defendants if they had disclosed all

foreign bank accounts open in 2012 and 2013. *Id*. Defendants responded that they had, even

though they had not disclosed the CIBC accounts. *Id.*; ECF 16-1, Ex. 101, at 36.

The IRS subsequently opened an examination under 31 U.S.C. § 5321(a)(5)(C), also

called an FBAR examination, due to Defendants' failure to report their foreign accounts in 2011,

2012, and 2013. ECF 15 at 11. On August 10, 2015, Agent Cook interviewed Mr. Mahyari alone.

*Id.* Mr. Mahyari disclosed the CIBC accounts and admitted they had not disclosed their foreign

---

[2] This Court notes that Defendants later seem to concede that Mr. Niebur did in fact ask Ms. Malekzadeh whether Defendants had interest in foreign bank accounts: "at [the 2011] meeting Mr. Niebur merely marched through a rote list of questions triggered by his tax software and completely failed to conduct any kind of follow-up once he asked a single question about foreign bank accounts and received a single negative response." ECF 16 at 16. But Defendants contend that it was a single question asked in an "unnecessarily confusing, verbose way, inquiring whether [D]efendants had an ownership interest or signatures on any foreign bank, trust, or brokerage accounts instead of simply asking if [D]efendants still had any bank accounts in Iran or other countries." *Id.*

accounts to Mr. Niebur. *Id*. Mr. Mahyari admitted that he never asked Ms. Yazdanyar or Mr. Niebur about Defendants' reporting requirements and never conducted any research of his own; he also stated that he did not believe the sale of the Lavasan property was taxable in the United States because it was acquired before Defendants became United States citizens. *Id*. at 11–12. On September 1, 2015, Agent Cook interviewed Ms. Malekzadeh alone. *Id.* at 12. During this interview, she stated that the Lavasan property was sold for $2,000,000 and that $1,000,000 remained in Iran. *Id*. She did not mention the CIBC accounts until Agent Cook specifically asked about them. *Id.* She also stated that she did not think their foreign accounts were reportable because they had an OFAC license. *Id*. Like her husband, Ms. Malekzadeh admitted that she did not ask Ms. Yazdanyar or Mr. Niebur about Defendants' reporting obligations or conduct any research about the same. *Id*.

Defendants nonetheless contend that, throughout their interviews with Agent Cook, they were "open and forthcoming about all of the issues relating to their Lavasan home sale and subsequent remission of sale proceeds to the United States." ECF 16 at 8. They explain that they repeatedly expressed confusion about their reporting requirements, including whether the OFAC license and their interviews with the IRS were sufficient to meet their FBAR reporting requirements. *Id*. at 8–9, 18; *see, e.g.*, ECF 16-1, Ex. 101, at 2, 6. Ultimately, in connection with the FBAR examination, the IRS determined that Defendants willfully failed to disclose qualifying foreign back accounts in 2011, 2012, and 2013, and imposed a penalty of $302,430 on each Defendant—$604,860 in total—for the violations. ECF 15 at 17.

## DISCUSSION

### A. The BSA and FBAR Reporting Requirements

Under the Bank Secrecy Act (BSA), United States citizens or resident aliens who have a financial interest in foreign bank accounts with an aggregate value exceeding $10,000 during the

taxable year must report that interest to the IRS by filling out an FBAR.[3] *See* 31 U.S.C. § 5314;

31 C.F.R. § 1010.350(a). FBARs are due by June 30th of the following year. 31 C.F.R.

§ 1010.306(c).

The IRS "may impose a civil money penalty on any person who violates" the FBAR

reporting requirements. 31 U.S.C. § 5321(a)(5)(A). The resultant penalty varies depending on the

person's level of culpability. For non-willful violations, "the amount of any civil penalty

imposed . . . shall not exceed $10,000." *Id.* § 5321(a)(5)(B)(i). In addition, no penalty shall be

imposed for non-willful violations if the violation was "due to reasonable cause" and "the

amount of the transaction or the balance in the account at the time of the transaction was

properly reported." *Id.* § 5321(a)(5)(B)(ii). For willful violations, "the maximum

penalty . . . shall be increased to the greater of" $100,000 or fifty percent of "the balance in the

account at the time of the violation." *Id.* § 5321(a)(5)(C)(i)(I); (D)(ii). There is no reasonable

cause exception for willful violations. *Id.* § 5321(a)(5)(C)(ii).

To prove a willful FBAR violation in civil suits, the Government must demonstrate by a

preponderance of the evidence that Defendants (1) are United States citizens or resident aliens,

(2) had a financial interest in, signatures on, or other authority over a foreign bank account; (3)

had a total balance across all foreign accounts exceeding $10,000 at some point during the

reporting period; and (4) willfully failed to disclose the account on an FBAR. 31 C.F.R.

§§ 1010.350, 1010.306(c); *see also Jones v. United States*, No. 19-CV-4950, 2020 WL 4390390

at *5 (C.D. Cal. May 11, 2020). There is no dispute in this case regarding the first three

elements. The parties agree that Defendants are United States citizens, controlled qualifying

---

[3] In 2011 and 2012, the relevant form was a Form TD F 90-22.1. In 2013, the relevant form was a FinCEN Form 114. For purposes of this order, this Court will refer to both as "FBARs."

foreign bank accounts exceeding $10,000 in 2011, 2012, and 2013, and did not timely file FBARs for these years. ECF 16 at 10. Thus, the only issue before this Court is whether Defendants' violations were willful.

## B.  Defining "Willful"

Section 5321(a)(5) does not define "willful" or explain how to assess whether a taxpayer acted willfully in failing to comply with the FBAR reporting requirements. Likewise, the Ninth Circuit has never defined "willful" in the civil FBAR context nor has a court in the District of Oregon.[4] Therefore, this is an issue of first impression for this Court.

The Supreme Court has held that "where willfulness is a statutory condition of civil liability," courts generally construe willful to include "not only knowing violations of a standard, but reckless ones as well." *Safeco Ins. Co. v. Burr*, 551 U.S. 47, 57 (2004). The Court further explained that, in the civil context, recklessness is an "objective standard" and includes "action entailing 'an unjustifiably high risk of harm that is either known or so obvious that it should be known.'" *Id*. at 68 (*quoting Famer v. Brennan*, 511 U.S. 825, 836 (1994)). The general consensus among the circuits that have considered willfulness in the civil FBAR context is that willfulness includes reckless disregard for the truth. *See United States v. Rum*, 995 F.3d 882, 889

---

[4] The Ninth Circuit has only addressed willfulness in the criminal FBAR context and only in an unpublished opinion. It held that the willfulness determination in the criminal context is a jury question: "The question of whether Defendants willfully failed to report income and file FBARs is one of fact for the jury." *United States v. Quiel*, 595 F. App'x 692, 694 (9th Cir. 2014). A court in the Western District of Washington considering willfulness in the civil FBAR context applied the standard generally used in criminal cases, holding that "a willful failure to file an FBAR Form requires proof that the defendant acted with knowledge that his conduct was unlawful, meaning he intentionally violated a known legal duty." *United States v. Pomerantz*, No. C16-689 MJP, 2017 WL 4418572, at *3 (W.D. Wash. Oct. 5, 2017) (internal citation and quotations omitted); *see Ratzlaf v. United States*, 510 U.S. 135, 137 (1994) (holding that for a criminal prosecution under the BSA, the Government must establish that "the defendant acted with knowledge that his conduct was unlawful" to prove the defendant committed a "willful violation.").

(11th Cir. 2021) ("[W]e hold that willfulness in § 5321 includes reckless disregard of a known or obvious risk . . . ."); *United States v. Horowitz*, 978 F.3d 80, 88 (4th Cir. 2020) ("[W]e conclude that, for the purposes of applying § 5321(a)(5)'s civil penalty, a 'willful violation' of the FBAR reporting requirement includes both knowing and reckless violations . . . ."); *Norman v. United States*, 942 F.3d 1111, 1115 (Fed. Cir. 2019) (same); *Bedrosian v. United States*, 912 F.3d 144, 152 (3d Cir. 2018) (same). Numerous district courts around the country have adopted this standard, including courts in the Ninth Circuit. *See, e.g.*, *United States v. Goldsmith*, 541 F. Supp. 3d 1058, 1083–84 (S.D. Cal. 2021); *United States v. Gentges*, 531 F. Supp. 3d 731, 743 (S.D.N.Y. 2021); *United States v. de Forrest*, 463 F. Supp. 3d 1150, 1157 (D. Nev. 2020); *United States v. Bernstein*, 486 F. Supp. 3d 639, 645–58 (E.D.N.Y. 2020); *United States v. Garrity*, 304 F. Supp. 3d 267, 273–74 (D. Conn. 2018); *United States v. Kelley-Hunter*, 281 F. Supp. 3d 121, 124 (D.D.C. 2017), *United States v. Bohanec*, 263 F. Supp. 3d 881, 888–89 (C.D. Cal. 2016); *United States v. McBride*, 908 F. Supp. 2d 1186, 1204 (D. Utah 2012). Because civil recklessness is an objective standard, courts have granted summary judgment on the issue of whether an FBAR violation was willful. *See, e.g.*, *Rum*, 995 F.3d at 891–92 (affirming the district court's grant of summary judgment); *Horowitz*, 978 F.3d at 82 (same).

Defendants have conceded that the "prevailing view among the reported cases on point permits the government to hold taxpayers liable for willful violations of the pertinent FBAR reporting requirements when the taxpayers recklessly disregard those requirements." ECF 16 at 10. Given the overwhelming weight of authority, this Court now holds that a willful violation of the FBAR reporting requirements includes both knowing and reckless violations for purposes of a civil FBAR penalty.

## C. Analysis

The Government argues that this Court should grant summary judgment because the undisputed facts demonstrate that Defendants intentionally, or recklessly, concealed foreign accounts and related taxable gains from the IRS, making their failure to file FBARs willful. ECF 15 at 2. Defendants respond that summary judgment is inappropriate because there are material facts in dispute. ECF 16 at 11–12. Defendants contend that "the central disputes about material facts boil down to simple he-said, she-said disagreements about whether [D]efendants or Mr. Niebur took certain actions or provided certain information," which require credibility determinations to resolve. *Id*. at 19. The Government replies that Defendants' claims are "either completely unsupported by anything in the record, in violation of the requirements in Rule 56(c)(1), or directly contradicted by the actual evidence." ECF 17 at 1.

A non-movant's sworn statements or depositions are to be taken as true and are sufficient under Rule 56 to withstand a motion for summary judgment. *Leslie v. Grupo ICA*, 198 F.3d 1152, 1159 (9th Cir. 1999); *see also Robins v. Centinela State Prison*, 19 Fed. Appx. 549, 550 (9th Cir. 2001). However, a court need not accept "'uncorroborated and self-serving' testimony" as true. *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002) (quoting *Kennedy v. Applause, Inc.*, 90 F.3d 1477, 1481 (9th Cir. 1996)). And a court need not draw inferences in favor of the non-moving party when those inferences conflict with overwhelming evidence favoring the moving party. *United States v. 1980 Red Ferrari*, 827 F.2d 477, 479 (9th Cir. 1987) ("[W]here a party opposing summary judgment fails to produce 'substantial factual evidence to combat summary judgment and there is overwhelming evidence favoring the moving party, it may be unreasonable to draw an inference contrary to the movant's interpretation of the facts, and therefore a summary judgment would be appropriate even when [state of mind] is at issue.'" (quoting *Barnes v. Arden Mayfair Inc.*, 759 F.2d 676, 681 (9th Cir. 1985)). While a court

must view the evidence in the light most favorable to the non-movant, a court "need not draw *all* possible inferences in [the non-movant's] favor, but only all *reasonable* ones." *Villiarimo,* 281 F.3d at 1061 n.10 (citing *O.S.C. Corp. v. Apple Computer, Inc.*, 792 F.2d 1464, 1466–67 (9th Cir. 1986)).

Defendants contend that they "faced significant barriers adjusting to American laws and practices and becoming proficient in the English language," ECF 16 at 12, and that their "limited English skills and little knowledge of the intricacies of the American tax system," made them "legitimately unaware," of the FBAR reporting requirements, *id.* at 14. At the outset, this Court notes that it will not draw the inference that Defendants' limited English proficiency prevented them from understanding their tax obligations. This Court finds that this inference is unreasonable in light of the record in this case: Defendants' characterization of their English comprehension is belied by overwhelming evidence in the record, including that Ms. Malekzadeh has had four English-speaking jobs and was a licensed insurance agent and mortgage broker, both of which require passing examinations administered in English, that Mr. Mahyari earned a Ph.D. from an English-speaking program, and that Defendants opened two bank accounts with CIBC in Canada, another primarily English-speaking country.[5] Moreover, even if this Court were to accept that Defendants, like many other immigrants, had difficulty understanding English, that fact would not insulate them from their reporting obligations. Accordingly, this Court will not consider Defendants' alleged English language limitations in determining whether there is a genuine dispute of material fact regarding the willfulness of Defendants' failure to report their foreign accounts.

---

[5] There is no evidence in the record that Defendants conducted business associated with the CIBC accounts in French.

### 1.  Undisputed Facts

Before turning to this Court's assessment of Defendants' willfulness, this Court finds it necessary to summarize the undisputed and disputed facts in this case. After careful review of the evidentiary record, this Court finds that the following facts are undisputed: Defendants are both highly-educated; at the time of Defendants' first FBAR violation, Ms. Malekzadeh and Mr. Mahyari had been living in the United States for ten and six years respectively; Defendants are sophisticated actors with assets in excess of two million dollars; Defendants sold the Lavasan property for $2,879,146.92 and moved at least $1,350,295 to the United States in 2011 alone, but submitted a 2011 tax return which provided a sale price and cost basis for the Lavasan property of $500,000, resulting in no capital gains; the proceeds from the sale of the Lavasan property comprised the vast majority of Defendants' income; Defendants spent significant time and effort tending to their assets in Iran derived from the sale of the Lavasan property but did not research their tax obligations related to holding assets in foreign bank accounts; Defendants understood that there were barriers to moving their assets from Iran to the United States and obtained an OFAC license to do so, which contained warnings that they were not relieved from other tax obligations as a result of obtaining the license; Defendants moved assets to the United States through Canada by using their CIBC accounts to purchase gold and silver bars; Defendants never disclosed the existence of the CIBC accounts to Mr. Niebur; and Defendants made multiple false statements about their foreign accounts to the IRS, including initially telling Agent Klyzek that they did not have any foreign accounts at all and later disclosing the EN accounts to Agent Cook but repeatedly failing to disclose the CIBC accounts.

### 2.  Disputed Facts

On the other hand, this Court finds that Defendants have set forth evidence that puts the following facts in dispute: whether Defendants disclosed the sale of the Lavasan property to Mr.

PAGE 15 – OPINION AND ORDER

Niebur;[6] whether it was Defendants or Mr. Niebur who decided to list a sale price and cost basis

for the Lavasan property of $500,000;[7] whether Defendants disclosed to Mr. Niebur that they had

obtained an OFAC license to move assets from Iran to the United States;[8] whether Mr. Niebur

asked Defendants if they had foreign accounts for purposes of preparing their tax returns;[9] and

whether Defendants disclosed the EN accounts to Mr. Niebur.[10] Thus, the issue before this Court

is whether there are material facts in dispute that pertain to Defendants' willfulness which

preclude this Court from granting summary judgment or rather the undisputed facts are sufficient

for a finding of willfulness as a matter of law. In assessing Defendant's willfulness, this Court

will address the EN accounts and the CIBC accounts separately.

---

[6] *See, e.g.*, ECF 16-4, Ex. B, at 20 (At her deposition, Ms. Malekzadeh testified, "[Mr. Niebur] knew about the sale of this property ever since I knew him."); ECF 15-4 at 16 (Mr. Niebur testified, "If I put it on the tax return as an Iranian home, then she [told me].").

[7] *See, e.g.*, ECF 16-3, Ex. A, at 44 (Mr. Mahyari testified, "[Mr. Niebur] said that we're going to say that the basis is [$]500,000, and . . . when you receive the whole money . . . then I can go back and fix this"); ECF 16-4, Ex. B, at 25 (When asked whether it was Mr. Niebur that "made a mistake in putting $500,000 down as the money you received . . .", Ms. Malekzadeh testified "Yes. Completely.").

[8] *See, e.g.*, ECF 16-4, Ex. B, at 22–23 (When asked whether she told Mr. Niebur about the OFAC license, Ms. Malekzadeh testified, "Yes. Yes," and when asked if she gave him the license, she testified, "Yes.").

[9] *See, e.g.*, ECF 16-1, Ex. 101, at 5 (Agent Cook's interview notes indicate Mr. Mahyari stated he "did not recall the preparer asking about foreign accounts . . ."); ECF 16-2, Ex. 102, at 4 (Agent Cook's notes also indicate Ms. Malekzadeh stated, "[Mr. Niebur] has not asked about foreign accounts or foreign assets . . . .").

[10] *See, e.g.*, ECF 16-4, Ex. B, at 23 (Ms. Malekzadeh testified, ". . . I did tell him there is money in the bank in Iran.").

PAGE 16 – OPINION AND ORDER

### 3. EN Accounts in Iran

Defendants opened a series of accounts with EN Bank in Iran in 2011 and had assets in those accounts during all three years at issue: 2011, 2012, and 2013.[11] Taxpayers who have foreign bank accounts must report those accounts to the IRS each year that the accounts have a combined balance exceeding $10,000. 31 C.F.R.§ 1010.306(c). Each year that Defendants did not disclose their qualifying accounts constitutes a separate violation for which the IRS imposed a separate penalty. *See* ECF 1 at ¶ 52. Accordingly, this Court will consider each year in turn.

With respect to 2011, this Court finds that the record demonstrates genuine issues of material fact, which preclude it from granting summary judgment as to whether Defendants' failure to disclose the EN accounts was willful. Defendants contend that they told Mr. Niebur they had assets in Iran and that Mr. Niebur did not ask about foreign accounts for purposes of preparing their tax returns. Defendants also contend that they provided Mr. Niebur with other information about their financial activity in Iran—including that they sold the Lavasan property, the true sale price of the property, and that they had obtained an OFAC license. While there is significant evidence in the record that weighs in favor of the Government, a reasonable jury could conclude from these facts that Defendants were forthright about their Iranian assets at least initially and did not willfully fail to disclose their EN accounts for the first year the accounts were open in 2011. This Court acknowledges that this is a close call, but nonetheless concludes

---

[11] The Complaint, ECF 1, refers only to one bank account opened with EN Bank in Iran. However, the Government's Motion for Partial Summary Judgment, ECF 15, refers to multiple EN accounts. For purposes of this Opinion & Order, this Court will refer to multiple EN accounts. The number of foreign accounts is immaterial for determining liability under the BSA because the reporting requirements are based on the total balance held in foreign accounts, not the number of those accounts. *See supra* Section A. Moreover, Defendants concede in their Response that they controlled qualifying bank accounts for the years at issue and that the only issue in this case is whether Defendants' failure to timely file FBARs was willful. ECF 16 at 10.

that Defendants have set forth enough evidence to survive summary judgment on the issue of willfulness for the EN accounts in 2011. Accordingly, the Government's Motion for Partial Summary Judgment is DENIED as to Defendants' failure to disclose the EN accounts in 2011.

However, this Court finds that Defendants' failure to disclose the EN accounts in subsequent years was at least reckless, and therefore willful, as a matter of law. Defendants contend that Mr. Niebur *never* asked them whether they had foreign accounts. However, Mr. Niebur testified at his deposition that he uses the same tax preparation software for every client. The software prompts a series of questions and will not generate a tax return unless an answer is provided to each question. One of these questions asks whether the client has ownership interest or signatures on any foreign bank accounts. Defendants do not contest whether Mr. Niebur used this software and even admit that the questions he asked were tied to prompts generated by his software. Further, Defendants' briefing is internally inconsistent, stating elsewhere that Mr. Niebur did, in fact, ask them whether they had foreign bank accounts. While this Court accepts at this stage that a jury could find that Mr. Niebur failed to ask Defendants the prompted question regarding their foreign accounts in 2011, this Court finds that it strains credulity to accept that Mr. Niebur failed to ask this automatically generated question three years in a row.

Moreover, undisputed evidence in the record suggests that Defendants' failure to disclose their accounts in Iran was at least reckless, including that Defendants are highly-educated, that they submitted a tax return reporting no capital gains on the sale of the Lavasan property, that the proceeds from the sale of the Lavasan property comprised the vast majority of their gross income and they spent significant time and effort tending to those proceeds, and that they initially lied to the IRS about their EN accounts. Further, even though Defendants retained both an attorney and a tax preparer, Defendants never asked either Ms. Yazdanyr or Mr. Niebur about their tax

obligations related to their foreign assets and did no research of their own, suggesting they made a conscious effort to avoid learning about their reporting requirements. These undisputed facts, taken together with the fact that this Court will not infer that Mr. Niebur failed in 2012 and 2013 to ask Defendants about their foreign accounts, tips the scale as to Defendants' willfulness for these years.

This Court need only draw *reasonable* inferences in favor of Defendants, not all inferences. *Villiarimo*, 281 F.3d at 1061 n.10. And if the record contains overwhelming evidence favoring the Government, it may be unreasonable to draw an inference contrary to the Government's interpretation of the facts. *Barnes*, 759 F.2d at 681. On this record, this Court concludes that it would be an unreasonable to infer that Defendants were not at least reckless. The overwhelming evidence in the record suggests that Defendants willfully failed to report their EN accounts in 2012 and 2013. Accordingly, the Government's Motion for Partial Summary Judgment is GRANTED as to Defendant's failure to disclose the EN accounts in 2012 and 2013.

### 4. CIBC Accounts in Canada

Defendants also had two accounts with CIBC in Canada, which they opened sometime between 2001 and 2005, long before selling the Lavasan property.[12] This Court finds

---

[12] The Government alleges in the Complaint that both CIBC accounts remained open until at least 2016, even though the account ending in -5238 had a high balance of $0 for 2012 and 2013. ECF 1 at ¶ 43. In its Motion for Partial Summary Judgment, the Government suggests that the account ending in -5238 was only open during 2011 and that the account ending in -2234 remained open through the end of 2013. *See* ECF 15 at 6, 11. Nonetheless, as previously stated, a taxpayer's FBAR reporting obligations do not depend on how many foreign accounts they have but instead on the cumulative balance across those accounts. *See supra* Section A. Moreover, even if Defendants closed the CIBC account ending in -5238, there is no evidence that they reported the other CIBC account ending in -2234 which remained open throughout each of the years at issue. The account ending in -2234 and the EN accounts together far exceeded the $10,000 threshold for mandatory reporting to the IRS. Thus, Defendants were required to disclose at least the CIBC account ending in -2234 to the IRS. Moreover, as stated above,

Defendants' failure to disclose the CIBC accounts during each of the years at issue was willful as a matter of law. The record demonstrates that, while Defendants may have been at least somewhat forthright regarding their financial activity in Iran, Defendants were decidedly less candid regarding their CIBC accounts. Indeed, the undisputed evidence in the record suggests that Defendants used these accounts to move money from Iran to the United States undetected.

Unlike the EN accounts, it is undisputed that Defendants *never* disclosed the CIBC accounts to Mr. Niebur. Moreover, Defendants do not dispute that they made multiple false statements to the IRS about the CIBC accounts and failed to disclose the accounts to the IRS until the bitter end. Defendants did not disclose the CIBC accounts to Agent Klyzek when he asked whether they had any foreign bank accounts. And when asked by Agent Cook whether they had any foreign bank accounts, they only disclosed the EN accounts. When then asked by Agent Cook if they had disclosed all foreign bank accounts, Defendants responded that they had. When asked the same question again, Defendants again responded that they had disclosed all accounts. After the interviews with Agent Cook, the IRS opened an FBAR examination into Defendants for failing to report their foreign bank accounts. Only then did Mr. Mahyari disclose the CIBC accounts in a subsequent interview with Agent Cook. And even after Mr. Mahyari had disclosed the CIBC accounts, Ms. Malekzadeh did not disclose the accounts until Agent Cook specifically asked her about them.

Moreover, there is evidence in the record that Defendants used the CIBC accounts to conceal assets from the United States government. Defendants used the accounts to move money from Iran to the United States. They did so by (1) transferring money from Iran to Canada, (2)

---

Defendants concede in their Response that they controlled qualifying bank accounts for the years at issue. ECF 16 at 10.

purchasing over $474,000 in gold and silver bars in Canada, (3) sending the gold and silver bars to the United States, and (4) selling the gold and silver bars, sometimes in their son's name. Using foreign accounts to conceal assets strongly suggests willfulness on the part of Defendants. Based on these facts, in addition to the other undisputed facts discussed above, this Court finds that Defendants were willful as a matter of law in failing to disclose their CIBC accounts. Accordingly, the Government's Motion for Partial Summary Judgment is GRANTED as to Defendants' failure to disclose the CIBC accounts in 2011, 2012, and 2013.

## CONCLUSION

For the reasons stated above, the Government's Motion for Partial Summary Judgment, ECF 15, is GRANTED in part and DENIED in part.

**IT IS SO ORDERED**.

DATED this 24th day of January, 2023.

/s/ Karin J. Immergut
Karin J. Immergut
United States District Judge